**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES DEPARTMENT OF DEFENSE; UNITED STATES DEPARTMENT OF AGRICULTURE; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; UNITED STATES DEPARTMENT OF JUSTICE; UNITED STATES SOCIAL SECURITY ADMINISTRATION; UNITED STATES DEPARTMENT OF VETERANS AFFAIRS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 6:25-cv-119 |
| *Plaintiffs*; | ) ) ) | |
| v. | ) ) | |
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, DISTRICT 10; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES NATIONAL JOINT COUNCIL OF FOOD INSPECTION LOCALS; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES COUNCIL 238; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES COUNCIL 222; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES COUNCIL OF PRISON LOCALS C-33; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES VA COUNCIL; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCALS 779; 1004; 1033; 1364; 1367; 1920; 2142; 2356; 681; 1903; 2771; 3523; 3941; 1003; 3320; 1030; 1298; 1637; 2459; 3809; 3828; 4044; 1038; 1454; 1633; 1822; 1934; 2437; 2836; 3511; and 3922, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) ) | |

## COMPLAINT FOR DECLARATORY RELIEF

### PRELIMINARY STATEMENT

1.      Since taking office, two of President Trump's top priorities for his Administration have been to improve the efficiency and efficacy of the federal workforce, and to promote the national security of the United States.  Unfortunately, many Executive Branch departments and agencies have been hamstrung in advancing both of those important efforts by restrictive terms of collective bargaining agreements (CBAs), including those negotiated or amended in the waning days of the prior Administration to tie the new President's hands.

2.      These CBAs significantly constrain the Executive Branch.  Indeed, their content and timing indicate they were intended to do just that, extending for as long as five years and past the end of the President's term, signed just following an election loss to keep a new Administration from taking charge of union relations and agency supervision on its own terms.

3.      Some of these "midnight" CBAs restrict return-to-work policies.  Others effectively delegate important decision-making to unaccountable private arbitrators in the form of grievance adjudication.  Virtually all limit the power of the President and his Executive Branch officials to promptly identify and address underperformance, thus impeding the President's Take Care Clause responsibility under Article II of the Constitution.  And for agencies and employees that work on national security matters, these CBAs also impinge on the President's efforts to protect the United States from foreign and domestic threats.

4.      Public servants, appointees, and officials come to work every day advancing the public interest, serving the American people, and furthering the President's agenda with energy. Like every large workforce, they deserve strong leadership and accountability that recognizes great

performance and winnows out inefficiency.  When inflexible CBAs obstruct presidential and agency head capacity to ensure accountability and improve performance, all citizens pay the price.

5.    And the price is particularly intolerable when national security is on the line.  One of the President's most important responsibilities is to oversee national security, investigative, and intelligence efforts on behalf of the United States and the American public.  *See* U.S. Const. art. II, §§ 1, 2, 3.  The President commands our nation's defense and military capabilities.  He necessarily does so through executive agencies and subdivisions that hold a primary function in supporting that important work, including by ensuring that our nation's economic, food supply, labor, transportation, trade, information and technology, and financial systems are not undermined by threats.  In exercising those critical functions, the President and his senior Executive Branch officials cannot afford to be obstructed by CBAs that micromanage oversight of the federal workforce and impede performance accountability.

6.    Congress acknowledged as much.  It acted to protect and preserve the Executive Branch's flexibility in these realms by including significant carveouts in the collective bargaining statutes administered by the Federal Labor Relations Agency (FLRA).

7.    In particular, Congress expressly excluded some agencies, including the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, the Secret Service, and certain others from collective bargaining. 5 U.S.C. § 7103(a)(3).  But recognizing the President's broad discretion to promote and protect national security and the national interest, Congress further empowered the President to issue an order excluding "*any* agency or subdivision thereof" from collective-bargaining requirements if the President determines that the entity has intelligence, counterintelligence, investigative, or national security work as "*a* primary function," and that collective-bargaining requirements cannot be applied to the entity consistent with both national security "requirements and *considerations*."  5 U.S.C. § 7103(b)(1) (emphases added).

The statute, in other words, authorizes the President to exempt certain segments of the federal workforce from federal labor-law requirements.

8.     In an Executive Order entitled *Exclusions from Federal Labor-Management Relations Programs* signed earlier today, President Trump made those necessary determinations for several agencies and subdivisions, including Plaintiff agencies (and/or their components) here.

9.     The Office of Personnel Management (OPM), which coordinates federal workforce policy, has since issued guidance encouraging the agencies and subdivisions covered by the Executive Order to take appropriate steps toward terminating their previously negotiated CBAs—and, once they have done so, to adopt certain personnel policies that align with the President's priorities, including expediting procedures for removing underperforming employees.

10.     In light of the Executive Order and OPM guidance, Plaintiffs now respectfully seek a declaratory judgment from this Court that they have the power to rescind or repudiate certain specified CBAs, local supplemental agreements, and MOUs with Defendants, the American Federation of Government Employees District 10 and various of its local unions (together, AFGE).

11.     Plaintiffs wish to rescind or repudiate those CBAs, including so they can protect national security by developing personnel policies that otherwise would be precluded or hindered by the CBAs.  But to ensure legal certainty and avoid unnecessary labor strife, they first seek declaratory relief to confirm that they are legally entitled to proceed with doing so.

### JURISDICTION AND VENUE

12.     This Court has jurisdiction under 28 U.S.C. § 1331, because this dispute involves a question of federal law under federal statutes and the Executive Order.  *See Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 197 (2014). This Court also has jurisdiction under 28 U.S.C. § 1345.

13.     In conjunction with their request for the remedy of a declaratory judgment, Plaintiffs assert that the Executive Order and its operation under the Federal Service Labor-Management Relations Statute and a similar statute that applies to the foreign service (together, the FSLMRS) vitiate their CBAs with Defendants.  Further, Plaintiffs' potential termination of the relevant CBAs—through implementation of the Executive Order and subsequent implementing steps as specified by OPM—create a conflict with continued federal union operation under the existing CBAs.  Plaintiffs consequently request a declaration from this Court that the President has lawfully, within the contours of his statutory discretion under 5 U.S.C. § 7103(b)(1), applied the national security exception through his expressed discretionary assessment and determination that the specified agencies and subdivisions are exempt from statutory CBA requirements.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant AFGE District 10 resides in this judicial district and represents over 90,000 federal workers in Texas, Mississippi, Louisiana, New Mexico, and Panama from its Killeen, Texas base of operations, and because relevant CBAs were ratified, managed, and/or performed within AFGE District 10, including in this judicial district.

15.     Plaintiff agencies employ and supervise employees covered by relevant CBAs for work performed within this judicial district and within the jurisdiction overseen by Defendant AFGE District 10.

**PARTIES**

16.     Plaintiff United States Department of Defense (DOD) is an executive agency headquartered at 1400 Defense Pentagon, Washington, DC 20301.

17.     Plaintiff United States Department of Agriculture (USDA) is an executive agency headquartered at 1400 Independence Ave. SW, Washington, DC 20250.

18.    Plaintiff United States Environmental Protection Agency (EPA) is an executive agency headquartered at 1200 Pennsylvania Ave. NW, Washington, DC 20004.

19.    Plaintiff United States Department of Homeland Security (DHS) is an executive agency headquartered at 1790 Ash St. SE, Washington, DC 20593.

20.    Plaintiff United States Department of Housing and Urban Development (HUD) is an executive agency headquartered at 451 7th St. SW, Washington, DC 20410.

21.    Plaintiff United States Department of Justice (DOJ) is an executive agency headquartered at 950 Pennsylvania Ave. NW, Washington, DC 20530.

22.    Plaintiff United States Social Security Administration (SSA) is an executive agency headquartered at 6401 Security Blvd., Baltimore, MD 21235.

23.    Plaintiff United States Department of Veterans Affairs (VA) is an executive agency headquartered at 810 Vermont Ave. NW, Washington, DC 20420.

24.    Defendant American Federation of Government Employees District 10 ("AFGE District 10") represents federal government employees in Louisiana, Mississippi, Texas, New Mexico, and Panama.  AFGE District 10 is headquartered at 2201 S. W.S. Young Dr, Suite 101-C, Killeen, Texas 76543.  AFGE District 10's headquarters are located within the Western District of Texas, Waco Division.

25.    Defendant American Federation of Government Employees Local 779 represents DOD employees at the Sheppard Air Force Base in Wichita Falls, Texas.

26.    Defendant American Federation of Government Employees Local 1004 represents non-professional DOD employees at Brooke Army Medical Center in Fort Sam Houston, Texas.

27.    Defendant American Federation of Government Employees Local 1033 represents DOD employees at Brooke Army Medical Center in Fort Sam Houston, Texas.

28.    Defendant American Federation of Government Employees Local 1364 represents DOD employees at the Naval Air Station Joint Reserve Base in Fort Worth, Texas.

29.    Defendant American Federation of Government Employees Local 1367 represents DOD employees at the Lackland Air Force Base in San Antonio, Texas.

30.    Defendant American Federation of Government Employees Local 1920 represents DOD employees in Fort Hood, Texas.

31.    Defendant American Federation of Government Employees Local 2142 represents DOD employees at Corpus Christi Army Depot in Corpus Christi, Texas.

32.    Defendant American Federation of Government Employees Local 2356 represents DOD employees at Dyess Air Force Base, Texas.

33.    Defendant American Federation of Government Employees National Joint Council of Food Inspection Locals represents employees at the USDA Food Safety and Inspection Service.

34.    Defendant American Federation of Government Employees Local 681 represents USDA employees in Dallas and Fort Worth, Texas.

35.    Defendant American Federation of Government Employees Local 1903 represents USDA employees in Dallas, Texas.

36.    Defendant American Federation of Government Employees Local 2771 represents USDA employees in Lubbock, Texas.

37.    Defendant American Federation of Government Employees Local 3523 represents USDA employees in Amarillo, Texas.

38.    Defendant American Federation of Government Employees Local 3941 represents USDA employees in Mt. Pleasant, Texas.

39.    Defendant American Federation of Government Employees Council 238 represents EPA employees.

40.     Defendant American Federation of Government Employees Local 1003 represents EPA employees in Region 6 in Dallas, Texas.

41.     Defendant American Federation of Government Employees Council 222 represents HUD employees.

42.     Defendant American Federation of Government Employees Local 3320 represents HUD employees in San Antonio, Houston, and Fort Worth, Texas.

43.     Defendant American Federation of Government Employees Council of Prison Locals C-33 represents DOJ employees in the Federal Bureau of Prisons.

44.     Defendant American Federation of Government Employees Local 1030 represents DOJ employees at the Federal Detention Center in Houston, Texas.

45.     Defendant American Federation of Government Employees Local 1298 represents DOJ employees at the Federal Correctional Institution in Fort Worth, Texas.

46.     Defendant American Federation of Government Employees Local 1637 represents DOJ employees at the Federal Correctional Institution in Seagoville, Texas.

47.     Defendant American Federation of Government Employees Local 2459 represents DOJ employees at the Federal Correctional Institution in Texarkana, Texas.

48.     Defendant American Federation of Government Employees Local 3809 represents DOJ employees at the Federal Correctional Institution in Fort Worth, Texas.

49.     Defendant American Federation of Government Employees Local 3828 represents DOJ employees at the Federal Correctional Institution in Bastrop, Texas.

50.     Defendant American Federation of Government Employees Local 4044 represents DOJ employees at the Federal Correctional Institution in Three Rivers, Texas.

51.     Defendant American Federation of Government Employees VA Council represents employees at the VA.

52.     Defendant American Federation of Government Employees Local 1038 represents VA employees at the Thomas E. Creek VA Medical Center in Amarillo, Texas.

53.     Defendant American Federation of Government Employees Local 1454 represents VA employees in the Veterans Benefits Administration Houston Regional Office in Houston, Texas.

54.     Defendant American Federation of Government Employees Local 1633 represents VA employees at the Michael E. DeBakey VA Medical Center in Houston, Texas.

55.     Defendant American Federation of Government Employees Local 1822 represents VA employees at the Doris Miller VA Medical Center in Waco, Texas.

56.     Defendant American Federation of Government Employees Local 1934 represents VA employees in Big Spring, Texas.

57.     Defendant American Federation of Government Employees Local 2437 represents VA employees in Dallas, Texas.

58.     Defendant American Federation of Government Employees Local 2836 represents VA employees at the Sam Rayburn Memorial Veterans Center in Bonham, Texas.

59.     Defendant American Federation of Government Employees Local 3511 represents VA employees at the Audie L. Murphy VA Medical Center in San Antonio, Texas.

60.     Defendant American Federation of Government Employees Local 3922 represents VA employees in El Paso, Texas.

## BACKGROUND

## I.    Statutory Background

61.     In 1978, Congress enacted the Federal Service Labor-Management Relations Statute ("Federal Service Statute").  *See* 5 U.S.C. § 7101 *et seq.*

62.    Although the Federal Service Statute generally grants federal agency employees the right to organize and collectively bargain, it also provides that the President "may issue an order excluding any agency or subdivision thereof from coverage of this chapter [5 U.S.C. ch. 71] if the President determines that—(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b).

63.    In 1980, Congress enacted the Foreign Service Act of 1980, chapter 10 of which concerns labor-management relations with regard to foreign service employees ("Foreign Service Statute"). Pub. L. No. 96-465, ch. 10, 94 Stat. 2071, 2128 (codified at 22 U.S.C. § 4101 *et seq.*).

64.    The Foreign Service Statute applies only to the Department of State, the United States Agency for International Development, and a few other agencies. 22 U.S.C. § 4103(a).

65.    The Foreign Service Statute allows the President to "exclude any subdivision of the Department from coverage under this subchapter if the President determines that—(1) the subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (2) the provisions of this subchapter cannot be applied to that subdivision in a manner consistent with national security requirements and considerations." *Id.* § 4103(b).

66.    Neither statute defines "national security work" or "investigative work" for purposes of the exemption, but the Federal Labor Relations Act (FLRA) has adopted plain text meanings and has provided some guidance in related contexts on the meaning of these terms.

67.    In particular, a 2014 FLRA decision upheld the ruling of a regional director who applied a "standard dictionary definition" of "investigative work" to mean work that involves "search[ing] into so as to learn the facts; inquir[ing] into systematically."

68. As to "national security work," FLRA precedent dating back to the Carter Administration defines national security as "those sensitive activities of the government that are directly related to the protection and preservation of the military, economic, and productive strength of the United States, including the security of the Government in domestic and foreign affairs, against or from espionage, sabotage, subversion, foreign aggression, and any other illegal acts which adversely affect the national defense."

## II.  Executive Order and OPM Guidance

69. On March 27, 2025, the President issued an Executive Order entitled *Exclusions from Federal Labor-Management Relations Program*.

70. In Section 2 of the Executive Order, the President determined that certain agencies and subdivisions have as a primary function intelligence, counterintelligence, investigative, or national security work. The President determined that the Federal Service Statute cannot be applied to these agencies and subdivisions in a manner consistent with national security requirements and considerations.

71. The Section 2 agencies and agency subdivisions included, with limited exceptions:

    a. Department of State

    b. Department of Defense

    c. Department of the Treasury, except the Bureau of Engraving and Printing

    d. Department of Veterans Affairs

    e. Department of Justice

    f. Subdivisions of the Department of Health and Human Services

        i. Office of the Secretary

        ii. Food and Drug Administration

        iii. Centers for Disease Control and Prevention

    iv.  Administration for Strategic Preparedness and Response

    v.  Office of the General Counsel

    vi.  Office of Refugee Resettlement, Administration for Children and Families

    vii.  National Institute for Allergy and Infectious Diseases, National Institutes of Health

    viii.  Office of the Chief Information Officer and all subordinate divisions

g.  Subdivisions of the Department of Homeland Security

    i.  Departmental Headquarters

    ii.  U.S. Citizenship and Immigration Services

    iii.  Immigration and Customs Enforcement (ICE)

    iv.  U.S. Coast Guard

    v.  Cybersecurity and Infrastructure Security Agency

    vi.  Federal Emergency Management Agency

    vii.  Office of the Chief Information Officer and all subordinate divisions

h.  Subdivisions of the Department of Interior

    i.  Office of the Secretary

    ii.  Bureau of Land Management

    iii.  Bureau of Safety and Environmental Enforcement

    iv.  Bureau of Ocean Energy Management

    v.  Office of the Chief Information Officer and all subordinate divisions

i.   Department of Energy

j.   Subdivisions of the Department of Agriculture

    i.   Food Safety and Inspection Service

    ii.  Animal and Plant Health Inspection Service

    iii. Office of the Chief Information Officer and all subordinate divisions

k.   International Trade Administration, Department of Commerce

l.   Environmental Protection Agency

m.   U.S. Agency for International Development

n.   Nuclear Regulatory Commission

o.   National Science Foundation

p.   International Trade Commission

q.   Federal Communications Commission

r.   General Services Administration

s.   The following agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code, the Social Security Administration, and the Office of Personnel Management:

    i.   Office of the Chief Information Officer; and

    ii.  Any other agency or subdivision that has information resource management duties as the agency or subdivision's primary duty.

72.     In Section 3 of the Executive Order, the President determined that certain subdivisions have as a primary function intelligence, counterintelligence, investigative, or national security work.  The President determined that the Foreign Service Statute cannot be applied to

these agencies and agency subdivisions in a manner consistent with national security requirements and considerations.

73.    The Section 3 agencies and agency subdivisions include:

    a.  Subdivisions of the U.S. Department of State

        i.  Each subdivision reporting directly to the Secretary of State

        ii.  Each subdivision reporting to the Deputy Secretary of State

        iii.  Each subdivision reporting to the Deputy Secretary of State for Management and Resources

        iv.  Each subdivision reporting to the Under Secretary for Management

        v.  Each subdivision reporting to the Under Secretary for Arms Control and International Security

        vi.  Each subdivision reporting to the Under Secretary for Civilian Security, Democracy, and Human Rights

        vii.  Each subdivision reporting to the Under Secretary for Economic Growth, Energy, and Environment

        viii.  Each subdivision reporting to the Under Secretary for Political Affairs

        ix.  Each subdivision reporting to the Under Secretary for Public Diplomacy

        x.  Each United States embassy, consulate, diplomatic mission, or office providing consular services

        xi.  Each foreign embassy or mission

    b.  Subdivisions of the U.S. Agency for International Development

        i.  All Overseas Missions and Field Offices

       ii.   Each subdivision reporting directly to the Administrator

      iii.   Each subdivision reporting to the Deputy Administrator for Policy and Programming

      iv.   Each subdivision reporting to the Deputy Administrator for Management and Resources.

74.    On March 27, 2025, OPM issued guidance regarding the Executive Order.  In that guidance, OPM opined that the covered agencies "are no longer required to collectively bargain with Federal unions" and that "the statutory authority underlying the agency's original recognition of the relevant unions no longer applies," so those unions are no longer exclusive representatives of the agency employees. OPM directed covered agencies to "consult with their General Counsels as to how to implement the President's directive" in the Executive Order, and to consider and implement changes that are "consistent with the President's national security determination."

75.    OPM also stated that, after terminating their CBAs, agencies should promptly align their workforce operations with President Trump's policies and management priorities, including strengthening performance accountability by making it easier to remove underperforming employees, imposing a return to in-office work, and more.

## III.   Plaintiff Agencies and Their Restrictive and Onerous CBAs

76.    Plaintiff agencies and/or their components are covered by the Executive Order.

77.    Plaintiff agencies and/or their components have previously executed with Defendants, or other local unions under the auspices of Defendants, one or more CBAs (including local agreements and MOUs) that remain currently in effect and cover employees in the relevant components.  The CBAs impose demanding burdens on Plaintiff agencies, and per the President's directive, undermine his authority to supervise and direct agencies with a primary function of

advancing the country's national security, intelligence, counterintelligence and investigative work. Plaintiff agencies therefore wish to rescind or repudiate them.

78.    As a general matter, and as discussed in more detail below, these CBAs give hostile unions powerful tools to prevent changes to agency operations they oppose. These CBAs likewise interfere with the President's ability to oversee the Executive Branch and limit his authority to oversee agents executing and implementing initiatives related to his core executive power, including as to national security.

79.    CBAs operate as binding legal instruments that take precedence over conflicting agency regulations. Agencies cannot even implement government-wide rules and regulations— including executive orders—that conflict with extant CBAs. Policies embedded in a CBA are thus locked in place until the agreement expires and, if it has a continuance clause, is fully renegotiated.

80.    The Biden Administration renegotiated many CBAs to last through most or all of President Trump's second term. This means the Trump Administration cannot alter agency policies on, *e.g.*, performance accountability, that are embedded in CBAs, even if the President believes they are a serious impediment to effective agency operations and thus national security.

81.    Bargaining obligations also stall many policy changes. Even if an agency wants to alter working conditions in ways that do not violate a CBA, it must give its union an opportunity to negotiate over the change. If the union chooses to bargain, the agency cannot make any changes until midterm bargaining concludes—a process that can easily take a year or more.

82.    FLRA case law is filled with decisions holding that agencies could not implement unilateral changes without seeking preclearance from union representatives or completing midterm bargaining. For example, the FLRA ruled that ICE committed an unfair labor practice by failing to bargain before changing cybersecurity practices (by cutting off access to personal e-mail accounts on work computers after learning that they were a vector for cyber attacks). The FLRA

16

similarly ruled that the VA could not use its new expedited removal procedures, granted by Congress under 38 U.S.C. § 714, without completing midterm bargaining with its unions. As a result, the VA had to offer reinstatement and backpay to over 4,000 AFGE-represented employees who had been removed.

83.     In short, unions that oppose an administration's agenda can freeze the status quo in place for a year or more by demanding midterm bargaining and dragging it out. Unions hostile to the President's agenda can thus block or at least significantly delay the implementation of management policies that he considers necessary to ensure the effective and efficient operations of agencies—including, as relevant here, agencies with investigative and national security responsibilities. That, in turn, undermines the President's authority to supervise his agents and threatens our Nation's security.

84.     The President cannot effectively execute the laws or promote national security if his supervision of agents engaged in national security, intelligence, counterintelligence, or investigative missions is stymied by intrusive bargaining agreements and continuous bargaining obligations. Congress therefore recognized the President's power to exempt agencies or sub-agencies from the statutes authorizing such bargaining agreements.

**A.     Department of Defense**

85.     The Air Force Material Command (AFMC) is a component of DOD that is covered by the Executive Order. AFMC manages installation and mission support, discovery and development, test and evaluation, and life cycle management services and sustainment for every major Air Force weapon system.

86.     The Army and Air Force Exchange Service is a component of DOD that is covered by the Executive Order. The Army and Air Force Exchange Service supports deployed troops with products and services.

87.     The Defense Commissary Agency (DeCA) is a component of DOD that is covered by the Executive Order.  DeCA operates a worldwide chain of commissaries and provides groceries in a safe and secure environment to military personnel and their families.

88.     The Defense Contract Management Agency is a component of DOD that is covered by the Executive Order.  The Defense Contract Management Agency provides contract administration services and ensures that the defense industry provides our nation's warfighters the equipment they need to fight, survive, and win.

89.     The Defense Finance and Accounting Service (DFAS) is a component of DOD that is covered by the Executive Order.  DFAS improves accounting and financial functions throughout DOD.

90.     The Defense Health Agency (DHA) is a component of DOD that is covered by the Executive Order.  DHA manages a global health system and integrates care delivered at military hospitals with a worldwide network of civilian health providers.

91.     The Defense Logistics Agency (DLA) is a component of DOD that is covered by the Executive Order.  DLA manages end-to-end global defense supply chain—from raw materials to end user disposition—for the five military services, eleven combat commands, and other federal, state and local agencies and partner and allied nations.

92.     The Marine Corps is a component of DOD that is covered by the Executive Order. The Marine Corps is responsible for delivering military task forces on land, at sea, and in the air.

93.     The United States Military Entrance Processing Command is a component of DOD that is covered by the Executive Order.  The United States Military Entrance Processing Command is dedicated to ensuring that each applicant for enlistment in our nation's volunteer force meets service-mandated aptitude, medical, and conduct qualifications standards.

94.    DOD and/or its agencies or components have entered into CBAs with Defendants, including the Air Force Material Command Master Labor Agreement; the Army and Air Force Exchange Service Master Agreement; the Defense Commissary Agency Master Labor Agreement; the Agreement Between Defense Contract Management Agency and AFGE Council 170; the Defense Finance & Accounting Service Master Collective Bargaining Agreement; the Defense Health Agency Interim Master Labor Agreement; the Defense Logistics Agency Master Labor Agreement; the Consolidated Master Labor Agreement between the United States Marine Corps and the American Federation of Government Employees; and the United States Military Entrance Processing Command Collective Bargaining Agreement.

95.    These CBAs include numerous terms that materially restrict the power of DOD and/or its agencies or components to govern and set policies for its own workforce.

96.    For example, the Defense Contract Management Agency CBA requires it to "encourage … the use of telework"; to retain underperforming employees through a 90-day performance improvement plan, followed by 30 days' notice before a performance-based decision is made; and to notify employees of any reduction in force at least 60 days in advance. *Agreement Between Defense Contract Management Agency and AFGE Council 170*, 38, 102-04, 169, https://www.afge.org/globalassets/documents/cbas/dcma-cba-2019.pdf.

97.    The Defense Finance & Accounting Service CBA requires it to spend taxpayer funds to provide union office space, furniture, workstations, and parking spaces at each of its five primary locations. *Master Collective Bargaining Agreement* 12, https://www.afge.org/ globalassets/documents/cbas/c171---dfas-contract.pdf.  The CBA also bars DFAS from denying telework to an employee even if the employee lacks "appropriate internet service" at his telework location and subjects denials of telework to grievance proceedings that can go to binding

arbitration. *Id.* at 25.  And the CBA requires DFAS to retain underperforming employees through an extendable 90-day performance improvement period.  *Id.* at 65.

98.    The Defense Health Agency CBA requires DHA to "actively promot[e]" telework for its employees.    *Interim Master Labor Agreement* 71, https://www.afge.org/globalassets/documents/generalreports/2024/interimconsolidatedmasteragr eement_4-19-24.pdf.    It also imposes a lengthy performance improvement period for underperforming employees, typically 90 days.  *Id.* at 68.

99.    The Defense Logistics Agency CBA provides for a 90-day performance improvement plan before an underperforming employee can be removed using the procedures of chapter 43 of title 5, United States Code. *Master Labor Agreement* 65-66, 105, https://www.afge.org/globalassets/documents/cbas/2022afgecouncil169cba.pdf.

100.    DOD and/or its agencies or components employ many workers in Texas who are part of Defendants' bargaining units and are covered by the CBAs, including: 917 AFMC employees; 444 DeCA employees; 836 Defense Contract Management Agency employees; 19 DFAS employees; 1063 DHA employees; and 321 DLA employees.

101.    It should go without saying that DOD and its agencies and components have, as their primary purpose, "intelligence, counterintelligence, investigative, or national security work." Indeed, the overriding mission of DOD is to protect national security.

**B.    Department of Agriculture**

102.    The Food Safety and Inspection Services (FSIS) is a component of USDA that is covered by the Executive Order.  The FSIS protects public health by preventing illness and ensuring food safety and defense.

103.    USDA and/or its agencies or components have entered into CBAs with Defendants, including the Food Safety and Inspection Service Collective Bargaining Agreement.

104.    That CBA includes numerous terms that materially restrict the power of USDA and the FSIS to govern and set policies for its own workforce.  For example, the FSIS CBA requires FSIS to arbitrate grievances at the union's request, Art. XXXIII; to apprise the union of any contemplated reductions in force "before any final decision has been made," Art. XXIII(A); to submit "proposed changes in conditions of employment" for its employees to the union for review before the changes can take effect; Art. VII(B), and to pay union representatives per diems and travel expenses to attend meetings and present grievances, Art. V(C).  *Collective Bargaining Agreement*, https://www.afge.org/globalassets/documents/cbas/c45---fsis-contract.pdf.

105.    USDA has many employees in Texas who are part of Defendants' bargaining units and covered by the CBAs, including 501 FSIS employees.

106.    One of FSIS's primary functions is investigative work—specifically, inspections into meat, poultry, and egg product safety.  FSIS also performs and has as a primary function national security work by protecting the nation's food supply.  FSIS defends against intentional contamination of meat, poultry, and egg products—key components of the U.S. food supply.  Under National Security Memorandum-16 (NSM-16, 2023), FSIS collaborates with intelligence and law enforcement to detect and respond to biological, chemical, or radiological attacks on food.  This has obvious national security implications.  A contaminated food supply could kill thousands, disrupt public trust, and destabilize government operations.

107.    Specifically, the Significant Incident Preparedness and Response Staff (SIPRS) within FSIS works with government agencies at all levels, industry, and other organizations to develop and implement strategies to prevent, protect against, mitigate, respond to, and recover from intentional contamination of the food supply.  FSIS promotes food defense by encouraging establishments to voluntarily adopt a functional food defense plan, implement food defense practices (including security measures), and conduct training and exercises to ensure preparedness.

108.    Food security is also important for economic stability.  FSIS oversees hundreds of billions of dollars in meat, poultry, and egg products each year.  Its inspections—which are mandatory at slaughter and processing—prevent outbreaks that could crater consumer confidence and trade.  This directly protects the economic and productive strength of the United States.

109.    FSIS also regulates imports from other countries, ensuring equivalence to U.S. safety standards (*e.g.*, it audited Brazil's system after 2017 meat scandals and suspended imports for a time until Brazilian producers came up to standards).  Food can be a vector for foreign threats, as the current avian flu outbreak demonstrates.

### C.    Environmental Protection Agency

110.    EPA is an agency covered by the Executive Order.  EPA's mission is to protect human health and the environment.  The Office of National Security within the Environmental Protection Agency administers programs that advance the nation's ability to prevent, protect, respond to, mitigate, and recover from intentional, unintentional, or natural events and disasters.

111.    EPA and/or its agencies or components have entered into CBAs with Defendants, including the Environmental Protection Agency Master Collective Bargaining Agreement. https://www.afge.org/globalassets/documents/cbas/afge---epa-mcba---2024-final-07.19.2024.pdf.

112.    That CBA includes numerous terms that materially restrict the power of EPA to govern and set policies for its own workforce.  For example, Article 2 is a new "scientific integrity" article expressly designed to empower the agency's career staff vis-à-vis political appointees and to prevent the Trump Administration from rolling back Biden Administration energy and climate policies.  Indeed, AFGE has advertised that the CBA was designed to affect substantive policy outcomes on energy and climate policy.  Given the effect those policies have on our economy and dependence on China for critical minerals, the President determined that Chapter 71 cannot be applied to EPA in a manner consistent with national security requirements and considerations.

22

113.    Like most other CBAs at issue, the EPA CBA also generally requires performance improvement periods of 90 days, and "[u]nder no circumstances" less than 60 days, before agencies can propose to remove an underperforming employees. *EPA Master Collective Bargaining Agreement*, Art. 17, § 5(H). This is between double and triple the 30 days the President has determined is generally appropriate for these evaluations.[1]

114.    EPA Region 6, which is headquartered in Dallas, Texas, has 634 employees in Texas who are part of Defendants' bargaining units and covered by the CBAs.

115.    One of EPA's primary functions is investigative work, namely conducting criminal and civil investigations into environmental violations.  As the FLRA has explained, EPA criminal investigators engage in work that affects national security, which the Authority has defined as "sensitive activities of the government that are directly related to the protection or preservation of the military, economic, and productive strength of the United States," *Dep't of Air Force,* 62 F.L.R.A. 332, 335 (2008), by "safeguarding the nation's land, water, and air." *United States EPA*, 70 F.L.R.A. 279, 283 (2017).

116.    EPA also serves a primary national security function through its role in energy policy.  The Clean Air Act empowers EPA to regulate greenhouse gas emissions, including by regulating American use of fossil fuels as opposed to renewable energy sources.  As Congress explained in creating the Department of Energy, the nation's shortage of nonrenewable energy sources and "increasing dependence on foreign energy supplies present a serious threat to the national security of the United States."  42 U.S.C. § 7111.  EPA policymaking regarding renewable energy sources may also have substantial effects on national security by promoting use of products,

---

[1] Office of Personnel Management, Guidance on Executive Order *Exclusions from Federal Labor-Management Programs* (March 27, 2025).

such as electric vehicle batteries, that would increase the United States's dependence on foreign adversaries like China for critical natural resources.

117.    EPA's role in energy policy also impacts national security through its effects on the nation's economic capacity.  For example, several Biden Administration EPA rules operated to shift power generation from fossil fuels to more expensive renewable sources, undermining America's economy by passing higher energy costs through every stage of production.  *See* 2023 Power Plant Carbon Pollution Standards, 40 CFR Part 60.  The President has declared a national energy emergency in large part because high energy prices hurt America's economic and productive capacity.  Everything that EPA is doing to prevent fossil fuel use has a direct bearing on America's economic and productive capacity, and thus U.S. national security.

### D.    Department of Homeland Security

118.    The Federal Emergency Management Agency (FEMA) is a component of DHS that is covered by the Executive Order.  FEMA works to make sure America is equipped to prepare for and respond to disasters.  The Nonprofit Security Grant Program, one of FEMA's programs, provides funding support for target hardenings and other physical security enhancements and activities to nonprofit organizations that are at high risk of a terrorist attack.

119.    The United States Citizenship and Immigration Services (USCIS) is a component of DHS that is covered by the Executive Order.  USCIS administers the country's naturalization and immigration system.

120.    The United States Coast Guard (USCG) is a component of DHS that is covered by the Executive Order.  USCG conducts military operations to defend the nation.

121.    DHS and/or its agencies or components have entered into CBAs with Defendants, including the National Protection and Programs Directorate (now Cybersecurity and Infrastructure Security Agency) Collective Bargaining Agreement; the Federal Emergency Management Agency

Collective Bargaining Agreement; the United States Citizenship and Immigration Services Collective Bargaining Agreement; and the United States Coast Guard Collective Bargaining Agreement.

122.    Those CBAs include numerous terms that materially restrict the power of DHS and its components to govern and set policies for its own workforce.

123.    For example, FEMA's CBA requires the agency to permit employees to spend thousands of on-duty hours on union matters and bars FEMA from firing underperforming employees except based on a performance improvement plan lasting "not less than" 60 days. *Collective Bargaining Agreement* 21, 47, https://www.afge.org/globalassets/documents/cbas/l4060---fema-contract.pdf.

124.    The U.S. Citizenship and Immigration Services CBA permits employees to spend up to 100% of their on-duty time in a given year on union matters. *Collective Bargaining Agreement*, Art. 7(d), https://www.afge.org/globalassets/documents/cbas/uscis-cba-2021.pdf. The "purpose" of the CBA's telework provisions is to "ensure" that employees can telework "to the maximum extent possible," requiring USCIS to approve telework applications "to the maximum extent possible" and limiting the reasons USCIS may revoke telework arrangements. Art. 29(a)(2), (f), (k). The CBA also bars USCIS from terminating remote work agreements "without a legitimate business reason," and it requires USCIS to arbitrate grievances at the union's request. Art. 13; Art. 30(q).

125.    The U.S. Coast Guard CBA, which took effect in the final month of the Biden Administration, makes all Coast Guard bargaining unit positions presumptively eligible for telework and sharply limits the reasons for which USCG can deny telework requests or terminate approved telework arrangements. *Negotiated Master Labor Agreement* 63, 66-67, https://www.afge.org/globalassets/documents/cbas/mla-afge-uscg---effective-december-17-

2024.pdf.  The CBA also obligates the USCG to provide dedicated union office space and workstations in 13 USCG facilities, *id.* at 196; bars the USCG from reducing force unless "all other means" of avoiding the reduction in force "have been exhausted," *id.* at 92; and requires the USCG to retain underperforming employees on a performance improvement plan lasting at least 60 days, *id.* at 107.

126.    DHS and/or its agencies or components have many employees in Texas who are part of Defendants' bargaining units and covered by the CBAs, including 350 USCIS employees, 19 USCG employees, and 153 FEMA employees.

127.    DHS and its covered agencies and components serve primary national security functions.  The National Protection and Programs Directorate, now called the Cybersecurity and Infrastructure Security Agency, performs a straightforward national security mission of protecting the Nation against foreign and domestic cyber threats.

128.    Likewise, USCG is, on its face, a national security agency dedicated to protecting the United States from security threats.

129.    FEMA's operations also serve a national security function through its role in disaster preparedness, response, and recovery, which strengthens the nation's resilience to crises that could destabilize critical infrastructure, the economy, or public order—key components of national security.

130.    For example, FEMA's Office of National Continuity Programs (ONCP) "guides the planning, implementation and assessment of continuity programs that enable federal, state, local, tribal and territorial governments to continue performing essential functions and delivering critical services when typical operations are disrupted by an emergency.  ONCP also ensures that at all times, the President, federal agencies and governments at all levels are able to provide timely

and effective alerts and warnings regarding natural disaster, acts of terrorism and other manmade disasters or threats to public safety."

131.    FEMA's National Exercise Program conducts simulations of large-scale disasters, including cybersecurity, public health, and terrorism scenarios, to test interagency coordination and readiness.

132.    FEMA also operates the Integrated Public Alert and Warning System (IPAWS), a national system that allows authorized entities to send emergency alerts to the public through multiple communication channels, including Wireless Emergency Alerts (WEA), the Emergency Alert System (EAS), and National Oceanic and Atmospheric Administration (NOAA) Weather Radio, enhancing communication and response capabilities during national security threats and other emergencies.

133.    FEMA's efforts in disaster response and mitigation help safeguard critical infrastructure—such as power grids, transportation systems, and communication networks—from natural disasters, cyberattacks, or terrorist attacks.

134.    Finally, USCIS conducts investigative work as it screens and vets immigration applications. Its work to screen out potential national security threats and prevent them from becoming U.S. residents is also important national security work. USCIS collects fingerprints and photographs and collaborates with agencies like the FBI to conduct security checks and share national-security relevant information.  More broadly, USCIS maintains the integrity of the U.S. immigration system, which is important national security work—as the prior administration's failures in this regard demonstrated.

### E.    Department of Housing and Urban Development

135.    The Office of the Chief Information Officer (CIO) is a component of HUD that is covered by the Executive Order.

136.    HUD and/or its agencies or components have entered into CBAs with Defendants, including the Department of Housing and Urban Development Collective Bargaining Agreement. Employees of HUD's Office of Chief Information Officer are covered by that agreement and subject to the Executive Order.

137.    That CBA includes numerous terms that materially restrict the power of HUD and its CIO to govern and set policies for its own workforce, including limiting arbitration of employee grievances, months of advanced notice before reductions in force, and a commitment to permit telework "to the maximum extent possible."    *See* HUD Contract 73, 163-64, 243, https://www.afge.org/globalassets/documents/cbas/c222---hud-contract.pdf243.    Moreover,   the CBA limits disciplinary actions to "just and sufficient cause"—a higher bar than the statutory "efficiency of the service" standard.

138.    The CBA also requires HUD to provide the union with "conveniently located" private offices—with "floor to ceiling walls and a lockable door"—in HUD buildings paid for by taxpayer dollars, along with taxpayer-funded computers, software, printers, office supplies, and cleaning services.  *Id.* at 226, 228-29.  The CBA additionally requires HUD to permit employees to spend thousands of hours of on-duty time working on union matters.  *Id.* at 220-22.

139.    HUD has 9 employees in Texas who are part of Defendants' bargaining units and covered by the CBAs.

140.    The HUD CIO office performs essential national security work through its role in cybersecurity.  Given the role of computer systems in government functions, cybersecurity is national security.  Hostile nation states like China, Iran, and North Korea are constantly seeking to penetrate agency computer systems.

141.    More specifically, CIO offices implement cybersecurity frameworks under the Federal Information Security Modernization Act (FISMA) of 2014, protecting agency systems

from cyber threats that could compromise national security, such as state-sponsored attacks or ransomware.  CIO offices also manage systems for storing agency data and personally identifying information—including data that, if shared with foreign governments or terrorist organizations, could pose substantial risks to national security.

F.    **Department of Justice**

142.    The Federal Bureau of Prisons (BOP) is a component of DOJ that is covered by the Executive Order.  BOP protects public safety by ensuring that federal offenders serve their sentences of imprisonment in facilities that are appropriately secure, humane, and cost-efficient.

143.    DOJ and/or its agencies or components have entered into CBAs with Defendants, including the Federal Bureau of Prisons Master Agreement.

144.    That CBA includes numerous terms that materially restrict the power of DOJ and its components to govern and set policies for its own workforce.

145.    For example, the BOP CBA requires at least nine months of notice to the union before any reduction in force.    *Master    Agreement*    59, https://www.afge.org/globalassets/documents/cbas/master-agreement-2021-amended-to-may-2026.pdf.

146.    The CBA also provides for union activities as part of employees' "paid duty time," and it requires the heightened "just and sufficient cause" standard for disciplinary actions.  *Id.* at 29, 37, 70.

147.    DOJ and/or its agencies or components have many employees in Texas who are part of Defendants' bargaining units and covered by the CBAs, including 1550 BOP employees.

148.    DOJ performs classic investigative work by investigating whether federal crimes have been committed and prosecution warranted.  Many DOJ components, including ATF, DEA, and the litigating divisions, all have as a primary function investigating whether crimes have been

committed. BOP likewise conducts internal investigations into inmate activities, like monitoring communications to disrupt security threats.

149.    One of DOJ's primary functions is national security work. DOJ has described its mission to include defending the interests of the United States, ensuring public safety against threats foreign and domestic, and providing federal leadership in preventing and controlling crime. That mission to protect public safety, particularly against foreign threats, is a conventional national security role. Consistent with that mission, DOJ litigating divisions prosecute terrorist and other foreign threats against U.S. citizens, while other DOJ arms investigate and prevent hostile actions.

150.    As relevant here, BOP in particular has a direct and primary national security function of incarcerating individuals who threaten the public safety of Americans. Those individuals include, but are not limited to, foreign terrorists. It would seriously threaten public safety if the government did not reliably detain violent criminals and terrorists. BOP also monitors inmate communications to detect and disrupt threats, such as terrorist threats. Notably, a 2020 DOJ Inspector General report faulted BOP for failing to identify all terrorist inmates admitted into its institutions and failing to sufficiently monitor their communications.

### G.    Social Security Administration

151.    The Office of the Chief Information Officer (CIO) is a component of SSA that is covered by the Executive Order.

152.    SSA and/or its agencies or components have entered into CBAs with Defendants, including the Social Security Administration National Agreement. Employees of SSA's Office of the CIO are covered by that agreement and subject to the Executive Order.

153.    That CBA includes numerous terms that materially restrict the power of SSA and its CIO to govern and set policies for their own workforce.

154.    For example, the CBA requires performance improvement plans to last at least 60 days and also imposes the heightened "just cause" standard for disciplinary actions.  *National Agreement* 135, 141, https://www.afge.org/globalassets/documents/ cbas/ 2019-ssa-afge-national-agreement.pdf.

155.    The CBA additionally provides for use of SSA office space and up to 250,000 on-duty hours by SSA employees for union activities.  *Id.* at 93-94, 186.  And the CBA limits SSA's authority to revoke telework agreements.  *Id.* at 99, 232.

156.    SSA and/or its agencies or components have 2,407 employees in Texas who are part of Defendants' bargaining units and covered by the CBAs.

157.    The SSA CIO office performs essential national security work through its role in cybersecurity.  Given the role of computer systems in government functions, cybersecurity is national security.  Hostile nation states like China, Iran, and North Korea are constantly seeking to penetrate agency computer systems.

158.    More specifically, CIO offices implement cybersecurity frameworks under the Federal Information Security Modernization Act (FISMA) of 2014, protecting agency systems from cyber threats that could compromise national security, such as state-sponsored attacks or ransomware.  CIOs also manage systems for storing agency data and personally identifying information—including data that, if shared with foreign governments or terrorist organizations, could pose substantial risks to national security.

**H.    Department of Veterans Affairs**

159.    The VA is an executive agency that is covered by the Executive Order.  The VA's mission is to care for those who have served in our nation's military and for their families, caregivers, and survivors.  Its Office of Operations, Security, and Preparedness provides strategic

leadership for the VA's nationwide national security operations, preparedness, security, and law enforcement missions and ensures integration across the department.

160.    The VA and/or its agencies or components have entered into CBAs with Defendants, including the Department of Veterans Affairs Master Agreement.

161.    That CBA includes numerous terms that materially restrict the power of the VA and its components to govern and set policies for the agency's own workforce.  For example, it requires underperforming employees' performance improvement periods to last at least 90 days. VA Master Agreement 134, https://afgenvac.org/wp-content/uploads/2023/08/VA-AFGE-2023-Master-Agreement.pdf.  Even though Congress gave VA new statutory authority at 38 U.S.C. § 714 to dismiss poor performers without such periods, VA could not use this authority because this CBA contractually required three-month improvement periods. *U.S. Dep't of Veterans Affs*., 71 F.L.R.A. 1113 (2020). VA was subsequently prohibited from seeking to remove lengthy improvement periods from its contract on the grounds that asking a union to make such a concession was bad faith bargaining. Opinion and Award, *AFGE Council 222 and Dep't of Hous. & Urb. Dev.*, F.M.C.S. Case No. 200310-04768, at 39–42 (Mar. 28, 2021), https://afgecouncil222.com/G/20gopoftdurtermnegarbd.pdf.  This CBA therefore functions to prevent VA from using its statutory authority under 38 U.S.C. § 714. The CBA further requires VA to apply the heightened "just and sufficient cause" standard to all disciplinary actions. VA Master Agreement, 50.

162.    This CBA also requires VA to give advance notice to employees and unions before opening investigations, tipping off subjects and enabling them to cover their tracks. *Id.* at 95. VA must further negotiate the local effect of changes agreed to in national negotiations, requiring extensive negotiations and delay before the agency can make most changes to working conditions. *Id.* at 243-244.

163.    The CBA additionally permits VA employees to spend up to 100% of their on-duty hours on union matters and requires the VA to use taxpayer funds to provide the union with office space, computers, printers, and other supplies and equipment. *Id.* at 245.

164.    The VA and/or its agencies or components have 29,582 employees in Texas who are part of Defendants' bargaining units and covered by the CBAs.

165.    Congress has given the VA a primary national security function, making the agency the backstop medical provider for American troops in times of war or any national emergency that involves armed conflict. Congress has also provided that this role may take precedence over almost everything else the VA does, excepting only the treatment of veterans with service-related disabilities. *See* 38 U.S.C. § 8111A.

166.    Congress has also tasked the VA with providing medical services during national disasters and national emergencies. *See* 38 U.S.C. § 1785. The agency used that authority during the COVID-19 pandemic. Effective response to national emergencies is a national security function.

## COUNT I
### (FSLMRS AND 28 U.S.C. § 2201)

167.    Plaintiffs reassert the allegations set forth above in paragraphs 1–166.

168.    The Declaratory Judgment Act authorizes federal courts to declare the rights of litigants. 28 U.S.C. § 2201. The Act serves an important function by allowing parties to seek legal clarity and resolve concrete disputes without taking actions that would expose them to potential liability (for example, by breaching or repudiating a contract, infringing a patent, or violating a statute). *See generally MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007).

169.    Here, the President has issued an Executive Order, entitled *Exclusions from Federal Labor-Management Relations Programs*, which excludes certain agencies and subdivisions

thereof from coverage under 5 U.S.C. Chapter 71.  Plaintiff agencies believe that, pursuant to that Executive Order, they may rescind or repudiate the CBAs described above.  And Plaintiff agencies wish to rescind or repudiate those CBAs, because they prevent Plaintiff agencies from adopting personnel policies that align with the President's priorities and interfere with the President's direction of agencies engaged in sensitive operations implicating the Nation's security, intelligence, counterintelligence, or investigative functions.

170.     An actual controversy has arisen and now exists between the parties concerning the rights and obligations of Plaintiffs under the terms of the CBAs.  Pursuant to those agreements, Plaintiff agencies must provide prolonged performance improvement periods for underperforming employees before proposing termination or removal in contravention of Administration priorities; must employ heightened burdens of proof for misconduct-based removals; must permit employees to perform union business during official duty hours payable by taxpayer-funded salaries and wages; suffer often lengthy midterm bargaining delays before they can substantively modify working conditions; and incur various other pecuniary, logistical, and procedural burdens on operations.

171.     Plaintiff agencies dispute their obligation to continue abiding by the terms of the CBAs because they have been exempted from the FSLMRS by the President's Executive Order issued pursuant to 5 U.S.C. § 7103(b).  That exemption has the legal effect of voiding the extant CBAs.  *See Pioneer Natural Res. USA, Inc. v. Paper, Allied Indus., Chem. & Energy Workers Int'l Union Local 4-487*, 338 F.3d 440, 441 (5th Cir. 2003) ("When the NLRB decertified the Union on September 18, 2000, the CBA automatically terminated by operation of law.").  And that basis for the invalidity of the CBAs arises under federal law, 5 U.S.C. § 7101 *et seq.*; 22 U.S.C. § 4101 *et seq.*, together with the Executive Order.

172.    But Defendants assuredly will not agree that the CBAs can be lawfully rescinded or repudiated.  Indeed, the National Council of the AFGE has explained that it is "fighting back" against any presidential efforts to streamline the federal workforce and will take steps to litigate against President "Trump's Attacks on Civil Service." *What AFGE Is Doing:  A Recap of AFGE's Major Actions Against Trump's Attacks on Civil Service* (March 3, 2025), https://www.afge.org/article/what-afge-is-doing-a-recap-of-afges-major-actions-against-trumps-attacks-on-civil-service-2/.

173.    There is accordingly a concrete and immediate dispute over the rights of the parties, leaving Plaintiff agencies with uncertainty regarding their power to terminate the subject CBAs pursuant to the Executive Order.  A declaratory judgment is thus appropriate to ratify that Plaintiffs need not continue abiding by the personnel, salary, promotion, and other policies imposed by the subject CBAs.

174.    The Court should declare that Plaintiff agencies do have the power and authority under the Executive Order to rescind or repudiate the subject CBAs.  The Executive Order was lawful under 5 U.S.C. § 7103(b).  Through the Executive Order, the President has determined that Plaintiffs agencies have "as a primary function intelligence, counterintelligence, investigative, or national security work." 5 U.S.C. § 7103(b)(1)(A).  The President has further determined that the provisions of 5 U.S.C. Chapter 71 cannot be applied to each such "agency or subdivision in a manner consistent with national security requirements and considerations." *Id.* § 7103(b)(1)(B).  The Executive Order thus properly excludes those agencies and subdivisions thereof from coverage under 5 U.S.C. Chapter 71.

175.    Because Plaintiff agencies have been properly excluded from coverage under 5 U.S.C. Chapter 71, Plaintiff agencies are free to rescind or repudiate CBAs that were previously negotiated with Defendants' unions.  The statutory provisions that make CBAs binding on

agencies are no longer applicable to Plaintiffs. 5 U.S.C. § 7114(c)(3), 22 U.S.C. § 4113(f)(3).  And once repudiation is accomplished, Plaintiff agencies will no longer be bound by the terms of the CBAs.  Plaintiff agencies will no longer have a duty to engage in collective bargaining with certain of their employees, and Defendants can no longer represent the employees in collective bargaining.

176.    For the reasons described above, the Court should declare that Plaintiff agencies have the power to terminate the subject CBAs pursuant to the Executive Order.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

1. Declare that Plaintiff agencies are authorized to terminate their CBAs pursuant to the Executive Order and OPM's implementing guidance; and

2. Award such other relief as the Court deems equitable and just.

Dated: March 27, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ERIC HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

*/s/ Emily Hall*
EMILY HALL (D.C. Bar No. 1780317)
Counsel to the Assistant Attorney General
Civil Division, United States Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Tel: (202) 307-6482
Fax: (202) 514-8071
emily.hall@usdoj.gov

ALEXANDER K. HAAS
Director, Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Branch Director, Federal Programs Branch

LISA ZEIDNER MARCUS
Senior Counsel, Federal Programs Branch

*Counsel for Plaintiffs*