# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| UNITED STATES DEPARTMENT OF DEFENSE, et al., | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Case No. 6:25-cv-00119-ADA |
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, DISTRICT 10, et al., | § § § § | |
| *Defendants*. | § § | |

## **DEFENDANTS' MOTION TO DISMISS**

## INTRODUCTION

Plaintiffs, eight federal agencies, filed this declaratory judgment action seeking the Court's permission to void certain collective bargaining agreements based on an executive order. The government filed that lawsuit before the executive order was published to the public. In other words, the government drafted an executive order and, before the subjects of that order even knew what it said, sued them, doing so before any actual controversy could have possibly existed.

That is not how Article III works. Article III requires a plaintiff, in order to access the federal courts, to demonstrate a concrete injury that can be redressed by a favorable ruling on the merits. It does not permit the government to turn to the courts for "legal certainty" in advance of a contemplated action. Indeed, Defendants searched for but were unable to find any instance in which the federal government filed a declaratory judgment action in its sovereign capacity seeking pre-approval for a course of conduct, let alone an instance in which such an action was allowed to proceed in the face of Article III objections. And in the few cases where state and municipal governments have attempted to file declaratory judgment actions of this kind, the federal district courts in Texas have rejected such attempts on Article III standing grounds.

As we show in more detail below, there are three independent reasons for dismissing this case. First, as sketched out above, Article III precludes any federal court from adjudicating Plaintiffs' declaratory judgment action. Second, venue is improper in this district. Finally, this Court should exercise its discretion under the Declaratory Judgment Act to decline to entertain a lawsuit that involves the wrong set of parties and that was clearly timed to preempt an anticipated lawsuit against the government—particularly while properly-asserted challenges to the executive order are being heard in other courts.

## FACTUAL BACKGROUND

### I.    The Parties

The Plaintiffs in this case are eight federal agencies that operate nationwide: the Department of Defense (DOD), the Department of Agriculture (USDA), the Environmental Protection Agency (EPA), the Department of Homeland Security (DHS), the Department of Housing and Urban Development (HUD), the Department of Justice (DOJ), the Social Security Administration (SSA), and the Department of Veterans Affairs (VA) (collectively, "the government"). Compl. ¶¶ 16–23.

Thirty-six of the 37 Defendants are local unions or councils that are affiliates of AFGE, a national union headquartered in Washington, D.C. Compl. ¶¶ 25–60; Sanghvi Decl. ¶¶ 2–3. Five of those affiliates are located outside of Texas:

- AFGE National Joint Council of Food Inspection Locals resides in Beloit, Wisconsin;
- AFGE Council 238 resides in Cape May, New Jersey;
- AFGE Council 222 resides in Alexandria, Virginia;
- AFGE Council 33 resides in Forrest City, Arkansas; and
- AFGE VA Council, contrary to the Complaint, resides in Salem, Virginia.

Sanghvi Decl. ¶¶ 22–32. Nationally, AFGE has more than 900 affiliates, located in nearly every judicial district in all 50 states, Puerto Rico, and the District of Columbia. *Id.* ¶ 13.

The remaining named Defendant, AFGE District 10, is an administrative subdivision of AFGE—one of twelve districts through which AFGE manages its affairs in various geographic regions. *Id*. ¶ 9–10. Unlike the other Defendants, District 10 is not an independent legal entity or labor organization. District 10 does not file annual reports with the Department of Labor. *Id.* at ¶ 10. It does not have members; nor does it have its own constitution or bylaws. *Id*. That is to say,

AFGE District 10 is not a juridical entity capable of being sued in its own name.[1]

## II.    The Executive Order and this lawsuit.

At approximately 10:07 PM EDT on March 27, 2025, the White House posted on its website an Executive Order titled "Exclusions from Federal Labor-Management Relations Programs" (Executive Order). Wheeler Decl. ¶¶ 4–7; *see also* Sanghvi Decl. ¶ 8 (explaining that AFGE was unaware of the contents of the Executive Order until that time). In the Executive Order, the President declared that a long list of federal agencies were excluded from application of the Federal Service Labor-Management Relations Statute (FSLMRS), pursuant to authority granted under that statute to exclude agencies that have "as a primary function intelligence, counterintelligence, investigative, or national security work" where the statute's provisions "cannot be applied . . . in a manner consistent with national security requirements and considerations." *See id.*, Ex. A § 1(a) (Executive Order); 5 U.S.C. § 7103(b). The same night, the Office of Personnel Management (OPM) issued a memorandum setting out guidance to agencies regarding the implementation of the Executive Order. *Id.*, Ex. B (OPM Memorandum). Among other things, the OPM Memorandum states that the agencies covered by the Executive Order "are no longer required to collectively bargain with Federal unions." *Id.* at 3.

The government filed this lawsuit at or before 8:24 PM EDT, about an hour-and-a-half before the Executive Order was made public. Wheeler Decl. ¶ 8. The government's Complaint asserts a single claim seeking a declaration under the Declaratory Judgment Act ("DJA") that the "Plaintiff agencies are authorized to terminate their CBAs pursuant to the Executive Order and

---

[1] Because District 10 is not a labor organization that represents employees or has members, none of the Defendants represent any employees at the Department of Homeland Security or the Social Security Administration. Sanghvi Decl. ¶ 37.

OPM's implementing guidance." Compl. at 36 (Request for Relief).

### III.    AFGE's lawsuit challenging the Executive Order

On April 3, 2025, AFGE, along with several other national unions that represent federal employees and are directly impacted by the Executive Order, filed suit in the United States District Court for the Northern District of California against the President, OPM, and a number of federal agencies, including many that are plaintiffs in this case (the DOD, VA, DOJ, DHS, USDA, and EPA). Complaint, *AFGE v. Trump*, Case No. 4:25-cv-03070 (N.D. Cal.), ECF No. 1 ("Union Lawsuit"). The Union Lawsuit claims that the Executive Order and OPM Memorandum violated the First and Fifth Amendments and were *ultra vires* under the FSLMRS. *Id.* ¶¶ 211–51. In particular, the Union Lawsuit alleges that the Executive Order unconstitutionally retaliates against AFGE and other plaintiffs for their protected First Amendment activity in opposition to administration policies. *Id.* ¶¶ 4–7. The plaintiffs in the Union Lawsuit seek declaratory and injunctive relief that the Executive Order is unconstitutional and *ultra vires*. *Id.* at 41.[2]

## ARGUMENT

### I.    The government lacks standing to seek declaratory relief against the defendants.

The Court should dismiss the government's claim for declaratory relief because the government lacks standing under Article III. *See* Fed. R. Civ. P. 12(b)(1). In particular, the government has not alleged an injury-in-fact that can be redressed by this Court.

The "irreducible constitutional minimum of standing" requires a plaintiff to show an "injury in fact" that is "fairly traceable" to the actions of the defendant and is "likely" to be

---

[2] The plaintiffs in the Union Lawsuit have moved for a preliminary injunction against the enforcement of the Executive Order and submitted several dozen declarations in support of that motion. Motion for TRO, Case No. 4:25-cv-03070 (N.D. Cal.), ECF No. 15.

"redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). To be an injury-in-fact, a threatened future injury must be "(1) potentially suffered by the plaintiff, not someone else; (2) concrete and particularized, not abstract; and (3) actual or imminent, not conjectural or hypothetical." *Stinger v. Whitley*, 942 F.3d 715, 720–21 (5th Cir. 2019) (cleaned up).

The Declaratory Judgment Act ("DJA") in no way alters that fundamental requirement. "Standing to seek declaratory judgment is subject to these same requirements" of ongoing or imminent harm that has a causal connection to the defendant's conduct and is redressable by the requested declaration. *BroadStar Wind Sys. Grp. LLC v. Stephens*, 459 Fed. App'x 351, 356 (5th Cir. 2012); *see also Hosein v. Gonzales*, 452 F.3d 401, 403–04 (5th Cir. 2006). The DJA "is procedural only" and the "constitutional limit on our jurisdiction to actual 'cases' or 'controversies' means that the traditional ingredients of standing must still be present." *Marriott Int'l, Inc. v. Danna*, 772 F. App'x 42, 45 (5th Cir. 2019); *see Lawson v. Callahan*, 111 F.3d 403, 405 (5th Cir. 1997) ("The meaning of 'actual controversy' for the purposes of [the DJA] is identical to the meaning of 'case or controversy' for the purposes of Article III."). Moreover, a "declaratory judgment plaintiff must establish that this requirement was satisfied at the time the complaint was filed." *Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir. 2009). "[P]ost-filing conduct is not relevant." *Id.*

The DJA was enacted to provide a judicial pathway when a plaintiff faces a specific kind of injury: "the Hobson's choice of foregoing their rights or acting at their peril" of being "subjected to some significant liability." *Tex. Emps. Ins. Ass'n v. Jackson*, 862 F.2d 491, 505 (5th Cir. 1988) (en banc). Here, the government faces no such peril. It has alleged no ongoing or prospective liability, financial or criminal, that the declaration it seeks would redress. *Cf. MedImmune, Inc. v.*

5

*Genentech, Inc.*, 549 U.S. 118, 122 (2007) (peril of treble damages); *Waste Connections, Inc. v. Chevedden*, 554 F. App'x. 334, 335 (5th Cir. 2014) (SEC enforcement action); *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 543 (5th Cir. 2008) (criminal liability).

The various harms that are alluded to in the Complaint are not the kinds of legally cognizable injuries that can support standing. The Complaint identifies three potential categories of harm: (1) "labor strife" stemming from disagreement with the Executive Order; (2) the alleged "harms" that flow from the procedural rights guaranteed by the affected collective-bargaining agreements themselves, and (3) a prediction of litigation against the government, brought by the unions that are affected by the Executive Order. None of these are legally sufficient.

**1.** First, the Complaint alleges that a declaration is necessary to "avoid unnecessary labor strife." Compl. ¶ 11. In support of this assertion, the Complaint predicts that unions like AFGE will disapprove of the President's Executive Order and its effect on their CBAs. *See id.* ¶ 172 ("Defendants assuredly will not agree that the CBAs can be lawfully rescinded."). The government also cites a press release that was issued by AFGE (who is not a Defendant) several weeks before the Executive Order was issued, which described the Union's prior opposition to various administration initiatives (not the Executive Order). *Id.*

Those allegations do not allege the kind of imminent, concrete injury necessary to establish standing. Obviously, the mere fact that a union or individual citizens disagree with government action does not injure the government. *See McKinley v. Baden*, 777 F.2d 1017, 1021 (5th Cir. 1985) (describing a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"). As for Plaintiff's suggestion of impending labor strife, that is speculative at best. The Complaint does not allege, even in the most conclusory fashion, that unions or employees will engage in labor actions in response to the Executive Order that would

disrupt its operations.[3] Nor, as a matter of fact, has any such labor strife occurred. Under the FSLMRS, federal employees are forbidden to strike. 5 U.S.C. § 7311. Plaintiffs do not allege that any federal-sector unions, let alone Defendants, have made any threats of or engaged in any violence or unrest. Finally, even assuming (against facts) that labor strife was an imminent threat, there is no reason to believe a judicial declaration would redress it. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court."); *Linda R.S. v. Richard D.*, 410 U.S. 614, 618 (1973) (no standing where it was "only speculative" that the requested relief would redress plaintiff's injury).

**2.** The second kind of alleged "injury" Plaintiffs assert derives not from the Executive Order or any actions by Defendants, but from the underlying contracts that the Executive Order purports to void. Specifically, Plaintiffs allege that they are harmed by the collective-bargaining agreements entered into by previous administrations, including the first Trump administration, because these agreements contain provisions that allegedly unduly restrict the government's ability to manage personnel. *See* Compl. ¶¶ 77–84, 96–99, 104, 112, 122–25, 137–38, 144–46, 153–55, 160–63. These alleged contractual restrictions, however, cannot confer standing because they are not imminent injuries, and they are not injuries caused by the actions of these Defendants. Rather, they are legally-permissible contractual provisions, negotiated and agreed to by Plaintiffs themselves, which have been in effect for decades. Moreover, because, according to the government's own allegations, those CBAs, and any allegedly harmful provisions they contain,

---

[3] We assume that, by "labor strife," the government is referring the types of disruptive labor actions and work stoppages that the collective-bargaining process is designed to prevent. *See* 29 U.S.C. § 151; *Maryland v. Wirtz*, 392 U.S. 183, 191 (1968). To the extent the government is referring only to the possibility that some employees might be *upset* by the Executive Order's impact on their bargaining rights, that is obviously not a concrete injury to the government. Nor would it be redressed by a favorable judgment in this case.

are already void under the Executive Order, *id.* ¶ 171, any harm deriving from these contracts has already been remedied and a declaration from this Court will therefore redress nothing.[4]

**3.** Plaintiffs' final alleged injury is legal "uncertainty," Compl. ¶ 173, which amounts to a prediction that AFGE (not Defendants) will file a lawsuit to enjoin the enforcement of the Order, *id.* ¶ 172. That alleged harm fares no better than the others as a legally cognizable injury under Article III. As an initial matter, whether Plaintiffs have suffered an injury sufficient to support standing is measured at the moment the Complaint was filed, *Vantage Trailers*, 567 F.3d at 748. Although AFGE has since filed a lawsuit to enjoin the President's Order, 4:25-cv-3070-JD, (N.D. Cal. Apr. 3, 2025), ECF No. 1, neither Defendants nor AFGE had made any decision (or threat) to do so at the time the Complaint was filed. Nor could they have, since they did not yet even know the reach of the Order. Wheeler Decl. ¶¶ 4–8; Sanghvi Decl. ¶ 8. Second, the "harm" of AFGE's subsequent lawsuit is precisely the same harm the government has imposed on itself by filing this case—that it will have to engage in litigation regarding the effects of the Executive Order. Moreover, the only remedy available to the plaintiffs in the Union Lawsuit is an order that the government revert to the status quo and continue to honor its existing CBAs and employees' statutory labor rights. That prospect is not the kind of "significant liability" necessary to establish

---

[4] The government cites *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), apparently for the proposition that any party that wishes to repudiate a contract can file for declaratory judgment. *See* Compl. ¶ 168. However, *MedImmune* did not hold that the DJA creates a freestanding cause of action for a party to ask a court for advance permission to abandon a contract. To the contrary, *MedImmune* made clear that the "coercion" necessary to give rise to a DJA claim must arise *not* from "compliance with the claimed contractual obligation" but rather "the consequences of failure to do so." 549 U.S. at 130 n.9. Indeed, the *MedImmune* Court expressly stated that the "limiting principle" of its holding lay in the severity of those consequences. *See id.* at 134 n.12 ("[T]he threat of treble damages and loss of 80 percent of petitioner's business" is sufficiently coercive). Here, the government has not plausibly alleged *any* tangible harm that would stem from its repudiation of the relevant CBAs, let alone harm that would satisfy the "limiting principle" of *MedImmune*.

standing in a DJA context. *Jackson*, 862 F.2d at 505; *see also supra* n.4. Indeed, it is the same risk that government faces every time it takes any action—that judicial review may follow.

For this reason, courts have rejected declaratory judgment lawsuits filed by a government seeking advance judicial approval of its actions. In *Texas v. Travis County*, the state of Texas filed suit several hours after a statute was enacted, seeking a declaration that the statute was constitutional. 272 F. Supp. 3d 973, 976 (W.D. Tex. 2017), *aff'd on other grounds*, 910 F.3d 809 (5th Cir. 2018). The State argued that it had standing because, among other reasons, Defendants had made "public statements of their intent to challenge the constitutionality" of the law. *Id.* at 979. The court dismissed that argument, concluding that the possibility of future litigation, and even the possibility that the Defendants would affirmatively violate the law, was not an imminent injury sufficient to confer standing. *Id.* at 980. The *Travis County* court favorably cited *Villas at Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 880 (N.D. Tex. 2008), where the court rejected a similar claim by a municipal government seeking pre-enforcement, declaratory approval of an ordinance. *Id.* at 885. As that court explained, "federal courts are not to provide prospective assurance that statutes pass constitutional muster." *Id.* The principles that led the courts to conclude that the plaintiffs lacked standing in *Travis County* and *Villas at Parkside* compels the same conclusion in this case.

In both *Travis County* and *Villas at Parkside*, as here, the government enacted a law and moved for pre-enforcement declaratory judgment, expressing concerns about anticipated litigation challenging the law and asking the court to preemptively determine the law's validity. 272 F. Supp. 3d at 976; 577 F. Supp. 2d at 881–82. Likewise, in both cases, the government, as a precursor to filing suit under the DJA, opted to delay the effective date of the relevant law in order to obtain

the court's blessing in advance.[5] 272 F. Supp. 3d at 979; 577 F. Supp. 2d at 881. And, in both *Travis County* and *Villas at Parkside*, the courts found the plaintiffs had not asserted an injury sufficient to confer standing. *Travis County*, 272 F. Supp. 3d at 980; *Villas at Parkside*, 577 F. Supp. 2d at 883–84. As the *Travis County* court explained, the mere threat of a legal challenge is nothing more than "the same potential threat every government agency at every level faces when it enacts a new law." 272 F. Supp. 3d at 980. "That is not a justiciable injury." *Id.*

\* \* \*

There is another, related reason why the Court must dismiss this case, which was also recognized in both *Travis County* and *Villas at Parkside*. Namely, the pre-enforcement declaration that the government is seeking in this case has all the hallmarks of a constitutionally prohibited advisory opinion. *See* Fallon, et al., *Hart and Wechsler's The Federal Courts & The Federal System* 56 (7th ed. 2015) (noting that the "constitutional bar" against advisory opinions includes providing "[a]dvice to a coequal branch of government prior to the other branch's contemplated action") (quotation omitted); *Muskrat v. United States*, 219 U.S. 346, 361 (1911) ("This attempt to obtain a judicial declaration of the validity of the act of Congress is not presented in a 'case' or 'controversy,' to which, under the Constitution of the United States, the judicial power alone extends."); *Travis County*, 272 F. Supp. 3d at 980; *Villas at Parkside*, 577 F. Supp. 2d at 884–85.

---

[5] Even taking the Complaint as true, the nature of the government's delayed enforcement here is puzzling. The Complaint alleges that CBAs are already void by operation of the Executive Order. Compl. ¶ 171. The government has already instructed agency heads that the affected unions immediately "lose their status" as exclusive bargaining representative. OPM Memorandum, at 3. Regardless, delayed enforcement—at least as to the affected CBAs—cannot save the government where the only purpose of that delay is to ask the Court for "legal certainty." Also, to the extent it is relevant, Defendants note that some federal unions have been informed that their CBAs and pending grievances filed pursuant to contractual grievance procedures have been terminated. Payroll deduction of voluntary union dues has also been stopped in many agencies. These issues are currently being litigated in the Union Lawsuit, amongst others.

The government's desire for "legal certainty" is understandable. It is precisely because it would be so convenient for the government to seek out such certainty in consultation with the judiciary that the prohibition on advisory opinions is necessary. But neither Article III nor the DJA permits the government to parlay legal uncertainty into standing to preemptively sue its own citizens for declaratory relief. To hold otherwise would be to deputize the courts as legal counsel for the government, available to issue precisely the kind of advisory opinions the Supreme Court has long held to be outside the judicial power. Indeed, if the government were permitted to seek a declaratory judgment in this circumstance, "it would open a Pandora's box and invite every local government to seek a court's judicial blessing on an ordinance . . . before it went into effect." *Villas at Parkside*, 577 F. Supp. 2d at 884-85. Fortunately, Article III's "ban on advisory opinions and the related doctrine of standing" ensure that "Pandora's box" is firmly sealed shut. *Travis County*, 272 F. Supp. 3d at 980.

## II.  This Court is not a permissible venue for the government's claims.

This case should also be dismissed for a second, independent reason—venue is improper in this district. The Complaint appears to advance two theories that venue is proper, both of which fail. First, the government alleges that "Defendant AFGE District 10 resides in this judicial district and represents over 90,000 federal workers in Texas, Mississippi, Louisiana, New Mexico, and Panama from its Killeen, Texas base of operations." Compl. ¶ 14. Second, the government alleges that "relevant CBAs were ratified, managed, and/or performed . . . in this judicial district." *Id.* As we show below, those allegations are insufficient to establish venue in this district.

In determining whether venue is proper under Fed R. Civ. P. 12(b)(3), "the court must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Braspetro Oil Servs. v. Modec (USA), Inc.*, 240 F. App'x 612, 615 (5th Cir. 2007). However, the

Court may also consider "evidence in the record beyond simply those facts alleged in the complaint and its proper attachments," including affidavits or evidence submitted by defendants in support of their motion to dismiss and by plaintiffs in response. *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 493 (5th Cir. 2018). "[O]nce a defendant raises the issue of improper venue, the plaintiff has the burden to prove that venue in that court is proper." *Gault v. Yamunaji, L.L.C.*, No. A-09-CA-078-SS, 2009 WL 10699952, at *2 (W.D. Tex. Apr. 17, 2009).

Venue here is governed by 28 U.S.C. § 1391(b). Under that statute, venue is proper only in "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." This action fits into none of these categories.

**1.** This action does not satisfy § 1391(b)(1) because five of the Defendants—namely, the out-of-state councils—are not residents of Texas. Residency for an entity defendant is defined as personal jurisdiction over that entity, 28 U.S.C. § 1391(c)(2), and a federal court can exercise personal jurisdiction over an out-of-state defendant based on either general jurisdiction or specific jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014).

As for general jurisdiction, the government cannot allege that the out-of-state councils, which are headquartered outside Texas and represent employees throughout the country, are "at home" in the state. *Id.* at 139 n.20 (an organization that "operates in many places can scarcely be deemed at home in all of them"); Sanghvi Decl. ¶¶ 19–32. The councils negotiated their CBAs, on a nationwide basis, directly with federal agencies—not individual facilities in Texas. Sanghvi Decl.

¶¶ 15, 22–32. The fact that those CBAs cover some Texans does not make the union subject to general jurisdiction in Texas, particularly where they cover many more elsewhere. *Dallas Texans Soccer Club v. Major League Soccer Players Union*, 247 F. Supp. 3d 784, 789–90 (E.D. Tex. 2017) (dismissing declaratory judgment claim against players' union where the union's contacts with two Texas teams were only a "portion" of "its activities nationwide").

A federal court may exercise specific jurisdiction over an out-of-state defendant if a plaintiff establishes: (1) an "activity or an occurrence" on the part of the defendant in the forum state, *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 582 U.S. 255, 262 (2017) (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011)), and (2) a nexus between the defendant's activity and the plaintiff's injury, such that the claim can be said to arise from that conduct, *id.* at 266 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984)). Specific jurisdiction must be established separately for each Defendant. *Id.* at 265, 268; *see Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) ("[U]nilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction.").

Here, at least with regard to the out-of-state councils, Plaintiffs fail on both prongs. The mere existence of the CBAs that were negotiated by Defendants—and that were negotiated on a nationwide basis with federal agencies to cover employees across the country—is not an "activity or an occurrence that takes place in the forum State." *Goodyear Dunlop Tires*, 564 U.S. at 919; *see Walden v. Fiore*, 571 U.S. 277, 291 (2014) (location of "relevant conduct" is what matters, not the location of its effects). As for the nexus of those CBAs to the government's injury; there is none. Whatever injuries derive from the CBAs themselves cannot be the basis for a claim where the CBAs are already declared void. Further, to the extent that the Plaintiffs argue that the relevant

conduct is AFGE's predicted lawsuit, that cannot be the basis for specific jurisdiction where (a) the Complaint contains no allegation that Defendants (as opposed to third parties) ever threatened a lawsuit, (b) the only allegation of any threat at all is a press release, summarizing previous actions not future ones, issued by a non-party in Washington, D.C., Compl. ¶ 172, and (3) no threat of litigation was targeted at or in Texas. *See Dallas Texans*, 247 F. Supp. 3d at 791 (no specific jurisdiction over national union where threat of litigation "was not directed to Texas residents any more than residents of any state.").

**2.** The action does not satisfy U.S.C. 28 § 1391(b)(2) because the events that gave rise to the government's claim did not occur in this district. To begin, the obvious event giving rise to the government's claim is not any action by Defendants, but the Executive Order. *See* Compl. ¶ 10 ("In light of the Executive Order and OPM guidance, Plaintiffs now respectfully seek a declaratory judgment from this Court."). There can be no dispute that this event occurred in Washington, D.C., not this district. Further, although it is true that the government's contemplated rescission of its CBAs affects federal employees in this district, that cannot support venue for two reasons. First, allegations about future events cannot satisfy § 1391(b)(2), which requires an analysis of "events or omissions" that have "occurred." Second, courts have repeatedly rejected arguments that venue is proper based solely on where the effects of an action are felt. *See, e.g.*, *Bigham v. Envirocare of Utah, Inc.*, 123 F. Supp. 2d 1046, 1048 (S.D. Tex. 2000); *Lalla v. G&H Towing Co.*, No. SA-19-CA-0542-FB, 2019 WL 11626516, at *1 (W.D. Tex. July 26, 2019); *Gault v. Yamunaji, L.L.C.*, No. A-09-CA-078-SS, 2009 WL 10699952, at *5 (W.D. Tex. Apr. 17, 2009).

Attempting to avoid this, Plaintiffs assert that "because relevant CBAs were ratified, managed, and/or performed within AFGE District 10, including in this judicial district," Compl. ¶ 14, venue is proper here. A district court, however, "should not accept venue if the activities that

14

transpired in the forum district were insubstantial in relation to the totality of events giving rise to Plaintiffs' claims." *Guardian Flight LLC v. Aetna Life Ins. Co. Inc*, No. 4:23-CV-00805, 2024 WL 5274520, at *2 (S.D. Tex. Mar. 28, 2024) (quoting *Andrade v. Chojnacki*, 934 F. Supp. 817, 827 n.18 (S.D. Tex. 1996)). In this case, it is clear that any events that did occur in this district are insubstantial compared to the totality of events giving rise to Plaintiffs' claims.

As an initial matter, Defendants represent a tiny fraction of unions and employees affected by the Executive Order. Even considering only AFGE and its affiliated unions, the Executive Order impacts 600,000 employees nationwide who work under CBAs that are mainly nationwide contracts signed by parties that do not reside in Texas, based on bargaining certifications that are mostly held in Washington, D.C. Sanghvi Decl. ¶¶ 5, 17–18. Moreover, even focusing only on the Defendant entities, the vast majority of their represented employees are covered by nationwide CBAs that were not signed by any of the Texas-based affiliates. *See id*. ¶¶ 15, 23, 25, 27, 29, 32, 34. Of the thirty-one local Defendants, only seven are signatories to CBAs that cover any of their represented employees (all of whom work at military bases in Texas, just three of which are located in this district). *See id.* ¶¶ 35–37. What is more, under the Federal Service Labor Management Relations Statute (FSLMRS), 5 U.S.C. § 7101 *et seq.*, only the organization that is named in the certification has the legal obligation to represent the covered employees. In this case, AFGE's records show that only four of the in-state Defendants (and only two in this judicial district) hold certifications in their own name. *See Id.* ¶¶ 18, 35(f), 35(g).

**3.** Finally, the action does not satisfy 28 U.S.C. § 1391(b)(3) because there is clearly an alternative venue available to the government: Washington, D.C., where the President signed the Executive Order and where the press release referenced in the Complaint was issued.

*    *    *

15

For the above reasons, venue is not proper in this district. Per 28 U.S.C. § 1406(a), the court should dismiss the case or, if it is "in the interest of justice," transfer it to a district where it could have been brought. Dismissal is the appropriate choice. There is another lawsuit pending in the Northern District of California, filed by AFGE and several other national unions affected by the Executive Order. The plaintiffs in that case have already moved for a preliminary injunction and submitted evidence in support. That case will provide for full adjudication of the validity and effect of the Executive Order—including constitutional claims under the First and Fifth Amendments that are not before this Court, and the claims of the vast majority of AFGE affiliates, as well as other unions, who are not party to this suit. Thus, for reasons of judicial efficiency and considering the arguments made *infra* in Part III, the Court should dismiss the government's claim.

### III.    The Court should exercise its discretion to dismiss the government's claim.

The Declaratory Judgment Act is "an enabling Act, which confers discretion on the courts rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995). "[A] district court is not required to provide declaratory judgment relief, and it is a matter for the district court's sound discretion whether to decide a declaratory judgment action." *Rowan Companies, Inc. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989). Although a district court may not dismiss a claim for declaratory relief on a "whim," a district court may decline to entertain such a claim, for example, because there is another pending court proceeding "in which the matters in controversy between the parties may be fully litigated," because "the declaratory complaint was filed in anticipation of another suit and is being used for the purpose of forum shopping," because of "possible inequities in permitting the plaintiff to gain precedence in time and forum," or because of "inconvenience to the parties or the witnesses." *Id.* at 29 (internal citations omitted); *see also*

*Sherwin-Williams Co. v. Holmes Cnty.*, 343 F.3d 383, 388 (5th Cir. 2003).[6]

    **1.** This Court should decline to entertain the government's claim for the primary reason that it was clearly filed in anticipation of a lawsuit by AFGE, the largest federal sector union, *see* Compl. ¶ 172, depriving Defendants and its parent organization, AFGE, of their right to frame its objections to the Executive Order and select the venue for its claims. *See Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 602 n.3 (5th Cir. 1983) ("Anticipatory suits are disfavored because they are an aspect of forum-shopping."); *Wilton v. Seven Falls Co.*, 41 F.3d 934, 934 (5th Cir. 1994) (declining to proceed with first-filed declaratory suit filed to "[a]nticipat[e] litigation"), *aff'd*, 515 U.S. 277 (1995). Just last year, the Fifth Circuit reiterated that Congress afforded *plaintiffs* who sue the federal government the right to choose their venue, even over the government's objection. *See generally In re Chamber of Commerce of United States of America*, 105 F.4th 297 (5th Cir. 2024). In *Chamber of Commerce*, the Fifth Circuit took the extraordinary step of issuing a writ of mandamus to vacate the trial court's decision to transfer a case under 28 U.S.C. § 1404(a). The court explained that plaintiffs suing the federal government have broad discretion as to venue when the suit involves an issue of nationwide concern. *See id.* at 308–09; *see also Stafford v. Briggs*, 444 U.S. 527, 542 (1980) (Congress meant "to provide nationwide venue for the convenience of individual plaintiffs in actions . . . against the Government.").

    Here, the government has engaged in conduct beyond that found impermissible in *Chamber of Commerce*; proactively filing a lawsuit in a venue of its choosing, seeking pre-approval of its

---

[6] Although there are other factors a district court must consider—e.g., whether "there is a pending state action" or if the federal court is being "called on to construe a state judicial decree"—they are not relevant here. *Sherwin-Williams*, 343 F.3d at 388; *see also id.* at 394 (clarifying that "the lack of a pending parallel state proceeding [does] not require [a] district judge to hear [a] declaratory judgment action").

actions, and timing its complaint so that the natural plaintiffs—*i.e.*, those parties whose rights were directly affected by the President's Order—could not possibly have filed suit first. That alone is reason enough to decline to entertain the government's suit. *See Travelers Ins. Co. v. La. Farm Bureau Fed'n, Inc.*, 996 F.2d 774, 776 n.7 (5th Cir. 1993) ("Using a declaratory judgment action to race to *res judicata* or to change forums is thoroughly inconsistent with the purposes of the Declaratory Judgment Act and should not be countenanced.").

The Fifth Circuit has acknowledged that a certain amount of "forum shopping" is baked into the system. "[A] plaintiff's motive for choosing a forum is ordinarily of no moment: a court may be selected because its docket moves rapidly, its discovery procedures are liberal, its jurors are generous, the rules of law applied are more favorable, or the judge who presides in that forum is thought more likely to rule in the litigant's favor." *In re Volkswagen of America, Inc.*, 545 F.3d 304, 321 (5th Cir. 2008) (King, J., dissenting). Nevertheless, the government's maneuver here is troubling for two reasons. First, it is designed to *deprive* plaintiffs of the ability to make the strategic decision described above. Second, and more importantly, this is the *federal government*. There is a vast difference between a citizen choosing what they believe to be a strategically advantageous forum in order contest unlawful government action and the Department of Justice using its vast resources to conjure and win a race to the courthouse—particularly where it has used those resources to win the race before the other side even knew there was one.

**2.** The Court should also decline to hear this case to further judicial efficiency. "[A] federal district court should avoid duplicative or piecemeal litigation where possible." *Sherwin-Williams*, 343 F.3d at 391. Unions directly impacted by the Executive Order have filed lawsuits challenging the validity of the Order on constitutional and statutory grounds. The potential for confusing and/or conflicting judgments is obvious. *Cf. ACQIS LLC v. EMC Corp.*, 67 F. Supp. 3d 769, 777 (E.D.

Tex. 2014) ("[T]he existence of duplicative suits involving the same or similar issues may create practical difficulties that will weigh heavily in favor of or against transfer."); *Experian Info. Sols., Inc. v. F.T.C.*, No. 3:00-CV-1631-H, 2001 WL 257834, at *4 (N.D. Tex. Mar. 8, 2001) (exercising discretion under § 1406 to dismiss rather than transfer because there were two related cases in a different jurisdiction).

Furthermore, the government's claim in this case will not resolve the larger dispute. The government seeks a declaration that "*[i]n light of* the Executive Order and OPM guidance," it has "the power to rescind or repudiate certain specified CBAs." Compl. ¶ 10 (emphasis added). That claim fails to anticipate the claims made by AFGE in its lawsuit, which challenges not only the rescission of the purportedly voided CBAs, but also the validity of the Executive Order itself on First Amendment, Fifth Amendment, and *ultra vires* grounds. *See generally* 25-cv-3070-JD, (N.D. Cal. Apr. 3, 2025), ECF No. 1; *see also MedImmune*, 549 U.S. at 139 ("[N]o controversy exists when a declaratory judgment plaintiff attempts to obtain a premature ruling on potential defenses that would typically be adjudicated in a later actual controversy.") (Thomas, J., dissenting).

**3.** A federal court should also "be less inclined to hear a case if necessary parties are missing." *Sherwin-Williams*, 343 F.3d at 391. The government's claim here would do nothing to resolve the rights of the other parties in the Union Lawsuit, which comprise not only AFGE in its *national* capacity, but also a wide swath of other unions representing federal employees across the country. What is more, the Court cannot even issue a decisive declaration as to the validity of most of the CBAs in this case, given that Defendants are not signatories to those contracts and the actual signatories are "strangers to [the] proceedings." *Martin v. Wilks*, 490 U.S. 755, 762 (1989). In short, to the extent there was any actual dispute between the government and federal sector unions when the Complaint was filed, that dispute was not with the locals and affiliates in this case. That

dispute is with the union plaintiffs in a different case, which is currently pending.

Finally, because the list of factors set forth by the Fifth Circuit in its prior decisions on this subject is "nonexclusive," *Sherwin-Williams*, 343 F.3d at 388, Defendants urge the Court to consider the institutional harms that would result from removing the barriers that block the government from seeking judicial pre-approval of its actions, in some cases before the affected individuals know or understand what those actions are, let alone how they will be applied. Here, the government is attempting to overturn long-settled precedent about the proper role of the courts—opening the floodgates for all variety of parties (public and private) to seek and obtain advance, advisory opinions about the legality of contemplated actions, short-circuiting legal claims by the natural plaintiffs who would challenge those actions. That danger is particularly grave when the plaintiff seeking declaratory relief is the federal government, leveraging both its informational advantage and "limitless litigating resources," *In re Space Expl. Techs., Corp.*, 99 F.4th 233, 234 (5th Cir. 2024) (Jones, J., dissenting), to circumvent the authority of Congress to set the rules of venue, and ultimately undermine the right of its citizens to petition the government.

## IV.    All claims against the out-of-state councils and District 10 should be dismissed.

For the reasons articulated in Part II, Council 33, Council 222, Council 238, the National Joint Council of Food Inspection Locals, and the VA Council move separately to dismiss the claims against them for lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). In addition, all claims against AFGE District 10 should be dismissed for failure to state a claim because it is not an entity that can be sued, nor is it a party to any CBA with Plaintiffs. *See* Fed. R. Civ. P. 12(b)(6).

## CONCLUSION

For the foregoing reasons, the Plaintiffs' lawsuit should be dismissed.

Date: April 21, 2025                                    Respectfully submitted,

                                                       /s/ *Charles Ainsworth*

Abigail V. Carter                                      Charles Ainsworth
D.C. Bar No. 474454                                    Texas State Bar No. 00783521
Joshua Shiffrin*                                       **Parker, Bunt & Ainsworth, P.C.**
Lane Shadgett*                                         100 E. Ferguson Suite 418
**Bredhoff & Kaiser, PLLC**                            Tyler, TX 75702
805 15th Street NW, Suite 1000                         Tel. (903) 531-3535
Washington, D.C. 20005                                 charley@pbatyler.com
Tel. (202) 842-2600
Fax (202) 842-1888
acarter@bredhoff.com
jshiffrin@bredhoff.com
lshadgett@bredhoff.com

*Attorneys for Defendants*

*\*Pro Hac Vice Motion Forthcoming*


## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing Motion is being sent to

counsel for Plaintiffs via the Court's electronic filing system on April 21, 2025.

                                                       /s/*Charles Ainsworth*