UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| UNITED STATES DEPARTMENT OF DEFENSE, et al., | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Case No. 6:25-cv-00119-ADA |
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, DISTRICT 10, et al., | § § § § | |
| *Defendants*. | § § | |

**<u>DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS</u>**

### I.    The Court lacks subject-matter jurisdiction to hear the government's claim.

*A.   The government lacks standing because it has not established a redressable injury-in-fact.*

The Declaratory Judgment Act ("DJA") does not change the fundamental rules of standing. *BroadStar Wind Sys. Grp. LLC v. Stephens*, 459 F. App'x 351, 356 (5th Cir. 2012). Rather, it authorizes a narrow remedy for a specific type of injury-in-fact—a "Hobson's choice of foregoing their rights," or "acting at their peril" of being "subjected to some significant liability." *Tex. Emps. Ins. Ass'n v. Jackson*, 862 F.2d 491, 505 (5th Cir. 1988) (en banc). Where, as here, a plaintiff seeks a declaratory judgment that a contract is invalid or unenforceable, it must demonstrate that the financial or criminal consequences of breaching the contract would be so severe that the plaintiff is "effectively coerced" into forgoing that conduct. *MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 129, 134 & n.12 (2007) (treble damages and loss of 80% of plaintiff's business); *see also* MTD 5-6 (citing cases). A plaintiff cannot establish standing merely by claiming harm from "compliance with the claimed contractual obligation." *MedImmune, Inc.*, 549 U.S. at 129, 130 n.9.

Here, the government seeks a declaratory judgment that the executive order (EO) is valid and therefore the government is "legally entitled" to rescind certain CBAs. Compl. ¶ 11. But the government has identified no potential injury from rescinding the CBAs that would be sufficiently severe to *coerce* it to forgo that course of action. Indeed, the government admits that it has implemented other aspects of the EO, including taking multiple actions in breach of the CBAs, apparently without fear of the consequences. Opp'n 10. Nonetheless, the government's brief makes three arguments in support of standing. None is persuasive.

**1.** The government's first contention is that it has standing to seek declaratory relief because the CBAs foreclose the government "from implementing this Administration's workforce policies." Opp'n 9. The government asserts, for example, that it is injured because the CBAs

require it "to pay employees for time spent on union activities," *id.* at 9, and "submit to third-party arbitration of most workplace disputes," *id.* at 7.[1] According to the government, it has standing because those "injuries can be remedied by a ruling in favor of Plaintiffs that the CBAs are null and void." Opp'n 9. But as previously explained, MTD 7-8 & n.4, a plaintiff seeking a declaratory judgment that a contract is unenforceable cannot show injury-in-fact from the burden of "compliance with the claimed contractual obligation," as the government attempts to do here, but rather must show that the "consequences of failure to" comply with those obligations are sufficiently severe to confer standing. *MedImmune*, 549 U.S. at 130 n.9.[2]

**2**. The government posits that if it rescinds the CBAs without permission, "the FLRA could," in the future, "order status quo ante (SQA) relief that would require Plaintiff agencies to rescind their actions, return to the prior status quo, give notice to the unions, and then engage in further bargaining." Opp'n 8. But any party that wishes to breach a contract can claim that if its breach is not absolved via declaratory judgment, it faces the risk of a subsequent order remedying the breach and returning the parties to the SQA. *MedImmune* teaches that this is not a cognizable injury; indeed, to recognize it as such would undo the "limiting principle" of *MedImmune*, which requires a threat of *coercive* sanctions, not purely remedial ones. 549 U.S. at 134 n.12.

**3**. Finally, the government argues for standing because it "could be liable for many millions of dollars in backpay" absent declaratory relief. Opp'n 8. This argument fails several times over.

---

[1] Contrary to the government's odd definition (Opp'n at 10 n.6), labor strife connotes *disruptive* conflicts, such as strikes. Contractual dispute resolution is the opposite: an "arbitral process which substitutes a regime of *peaceful* settlement for the older regime of industrial conflict." *See Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 585 (1960) (emphasis added).

[2] *Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316 (2008), cited by the government for the contrary proposition, is readily distinguishable. There, when the bank sued for declaratory relief to invalidate a tribal judgment, the judgment was forcing the bank both to pay $750,000 to the defendant and to unwind a sale of land it had previously made. The bank was not, like the government here, seeking absolution in advance from ongoing contractual duties.

First, the government's Complaint contains no allegation that the government could accrue any backpay liability, let alone that the potential liability is severe enough to coerce it from rescinding the CBAs. *See Energy Coal v. CITGO Petrol. Corp.*, 836 F.3d 457, 462 n.4 (5th Cir. 2016) ("[A] complaint may not be amended by the briefs in opposition to a motion to dismiss.").

Next, even setting that defect aside, the government cannot argue that a declaratory judgment action is necessary to reduce its exposure to any backpay liability. That is because any traditional *challenge* to the EO would similarly reduce the government's exposure to backpay liability, so long as the challenge was filed promptly. Here, there has been such a prompt challenge: AFGE filed suit within a week of the EO's publication. *See AFGE v. Trump*, 25-cv-3070-JD (N.D. Cal. Apr. 3, 2025) (preliminary injunction motion pending). Indeed, the government's Complaint predicted that AFGE "will take steps to litigate against" the EO, linking to an AFGE press release listing several lawsuits the union had filed in response to several previous Executive actions. Compl. ¶ 172. Notwithstanding the government's late-in-the-day attempt to revise its theory of harm, this is not a case where the declaratory judgment plaintiff fears that an adverse party will delay until just before the statute of limitations expires to sue, as "millions of dollars" in damages mount. *Cf. Jackson*, 862 F.2d at 505. Quite the contrary, this is a case where the plaintiff fears the opposite: that AFGE will exercise the traditional prerogative of an injured party to bring suit promptly in an appropriate forum of its choosing.

Beyond all this, the government's suggestion that it may be ordered to provide backpay if it fails to comply with the CBAs is too speculative to create the concrete, imminent injury necessary for standing. That is because a speculative "chain of contingencies" must transpire before the government could be liable for "millions of dollars" in backpay attributable to CBA breaches. *See Hemlock Semiconductor Corp. v. Kyocera Corp.*, 747 F. App'x 285, 292 (6th Cir.

2018) (DJA suit unripe because money due under an acceleration provision was "not due and may never be") (citing *MedImmune*, 549 U.S. at 128). The government has not specified any employees it wishes to terminate, let alone in this district, or explained how those unspecified terminations would violate the CBAs. *Cf. Orix Credit All. v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000) (DJA claim nonjusticiable where it was uncertain serial litigator would file motion or what content would be). Nor, in the absence of those specifics, can the government say that the CBAs it wishes to repudiate provide the only source of the feared liability. That omission matters because, even if the CBAs are rescinded, terminated federal employees have numerous independent protections that could entitle them to backpay. *See* 5 U.S.C. § 5596(b). The DJA does not allow the government to seek determination of the validity of the CBAs when that issue "may, or may not" even resolve the government's backpay liability. *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998).[3]

   B.  *The government seeks an advisory opinion.*

       The principle that Article III courts may not provide advice to the Executive Branch prior to that branch's contemplated action stretches to the earliest days of the Republic, when the Supreme Court refused a request from the Washington administration to analyze whether the United States was obligated to take certain actions under a treaty with France. *See* 3 *Correspondence & Public Papers of John Jay 1782-1793*, at 486-89 (Henry P. Johnston ed., 1891). The government's request for a declaratory judgment to bless the EO runs afoul of this long tradition and appears to be unprecedented.

       The DJA was enacted in 1934, and since then, the Executive Branch has issued thousands of executive orders. Yet the government identifies no instance where it filed a declaratory judgment

---

[3] The government also fails to show that any amount of backpay liability would be sufficiently coercive to the United States to justify a declaratory judgment action. Backpay after all is a paradigmatic remedial, not punitive or coercive, remedy.

action seeking approval of an executive order, or *any other* government initiative, let alone an instance where such an action was allowed to proceed. "Perhaps the most telling indication of the severe constitutional problem" with the government's request "is the lack of historical precedent." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010).

The government's attempts to distinguish *Texas v. Travis Cnty.*, 272 F. Supp. 3d 973, 980 (W.D. Tex. 2017), *aff'd on other grounds*, 910 F.3d 809 (5th Cir. 2018), and *Villas at Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 880, 884-85 (N.D. Tex. 2008), are unavailing. In those cases, state and municipal governments delayed enforcement of enacted laws and instead brought claims for declaratory judgment seeking judicial ratification; the federal courts dismissed those claims, citing Article III's "ban on advisory opinions." *Travis County*, 272 F. Supp. 3d at 980; *Villas at Parkside*, 577 F. Supp. 2d at 881-82. The government argues that the cases are inapposite because the laws at issue in those cases were "not even in effect" when litigation was initiated. But that is precisely the situation here, where the government has postponed enforcing one aspect of the EO and now asks this Court to decide the legality of doing so. Compl. ¶ 11.

## II.    The Court should exercise its statutory discretion to decline jurisdiction.

The government largely fails to respond to Defendants' arguments as to why the Court should exercise its discretion to decline jurisdiction under the non-exclusive *Trejo* factors, *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590-91 (5th Cir. 1994); Opp'n 18-20. In considering those factors, a court is "guided by" three fundamental concerns: "federalism, fairness, and efficiency." *Redpoint Cnty. Mut. Ins. Co. v. Admiral Ins. Co*., 2024 WL 1813443, at *2 (W.D. Tex. 2024). The first concern (federalism) is inapplicable here; the others weigh strongly against jurisdiction.

**1.** Fairness. Fairness concerns counsel against declaratory jurisdiction when the plaintiff *"*filed suit in anticipation of a lawsuit filed by the defendant," the plaintiff "engaged in forum shopping in bringing the suit," and there would be "inequities in allowing the declaratory plaintiff

5

to gain precedence in time or to change forums." *Trejo*, 39 F.3d at 590-91. Courts consider these factors "to combat 'procedural fencing' by manipulative declaratory judgment plaintiffs." *Phila. Indem. Ins. Co. v. Odessa Fam. YMCA*, 2021 WL 4237667, at *4 (W.D. Tex. 2021). "Declaratory judgments are not to be used defensively to deny a prospective plaintiff's choice of forums." *Indem. Ins. Corp. v. Austin Lucky Lounge, LP*, 2011 WL 5593657, at *5 (W.D. Tex. 2011).

This case is a prime example of procedural fencing. As Defendants have emphasized, the government not only filed suit in anticipation of litigation, *see* Compl. ¶ 172, it did so before the EO was published. MTD 1, 3. That was necessarily before "the declaratory defendant[s] [were] legally able" to bring a claim of their own—a classic example of "impermissible 'procedural fencing.'" *Sherwin-Williams Co. v. Holmes Cnty.*, 343 F.3d 383, 397 & n.7 (5th Cir. 2003).

The government has also engaged in gamesmanship to control the forum. To defend venue, the government contends that it seeks narrow relief only against the named defendants, which are a hand-picked subset of affiliates of AFGE. Opp'n 16; *see also Sherwin-Williams*, 343 F.3d at 397 & n.7 (procedural fencing where plaintiff picks and chooses defendants to access chosen forum). But despite its avowals here that this is only a "narrow" suit seeking narrow relief, Opp'n 20, in the larger suit AFGE brought challenging the EO in the Northern District of California, the government has asserted that the California court should transfer that case to this jurisdiction on the grounds that this suit was "first-filed." *See* Statement, *AFGE v. Trump*, No. 3:25-cv-3070 (N.D. Cal. May 2, 2025), ECF No. 46. By filing this suit before making the EO public, the government maneuvered to win the race to the courthouse before the starting gun even fired, tailoring its suit narrowly to justify venue here. Now it is seeking to leverage that ploy, over AFGE's objections, to move the entire controversy to its chosen jurisdiction. *See* MTD 17-18.

**2.** Efficiency. "[A] federal court, in exercising its discretion to grant or refuse relief, should

avoid needless conflict with other courts, state or federal." *Emp's' Liab. Assurance Corp. v. Mitchell*, 211 F.2d 441, 443 (5th Cir. 1954). That is precisely the situation here, where there are multiple traditional lawsuits challenging the EO in other venues across the country, including the suit brought by AFGE in N.D. Cal. MTD 4. That lawsuit, unlike this one, will resolve the government's legal uncertainty as to all contracts held by AFGE and its affiliates, including the agreements that are at issue here, and do so for all employees, not just those in this district and state. *Koch Project Sols., L.L.C. v. All. Process Partners*, L.L.C., 2022 WL 16859961, at *7 (5th Cir. 2022) ("Federal courts 'should avoid duplicative or piecemeal litigation where possible.'").

**3.** <u>Additional factors.</u> Exercising jurisdiction here would also create undesirable incentives. By all indications, the Executive Branch has never come to a federal court to seek a declaratory judgment on the pre-enforcement validity of a law. Permitting the government to do so here could open a "Pandora's Box," *Villas at Parkside*, 577 F. Supp. 2d at 884-85, and encourage the government to sue its own citizens, seeking pre-enforcement rulings as a matter of course. That practice would in turn subvert a basic principle of liberty, which is that when the government injures a private citizen, the citizen should be the party with a right to petition the courts for redress.

**III.    This Court is not a permissible venue for the government's claims.**

The government argues venue is proper here because (1) all the defendants are residents of Texas and (2) the actions giving rise to this lawsuit arose in Texas. The government is mistaken.

**1.** As Defendants' opening brief established, the out-of-state councils are not residents of Texas because this Court has neither general nor specific jurisdiction over them. MTD 11-13. In their opposition, the government does not contest that this Court lacks general jurisdiction over the Councils, arguing only that the Councils have sufficient minimum contacts with the state to satisfy the requirements for specific jurisdiction. Opp'n at 12-13. In particular, the government argues that the Councils negotiated nationwide CBAs that cover employees in Texas, that certain

provisions of those CBAs are implemented to protect residents of Texas in Texas, and that the Councils "supervise local chapters' performance of such activities under the CBA." *Id*. at 13.

Notably, the government's argument on those points does not cite to a single paragraph of the Complaint. *See id.* at 13. Nor could it, as the Complaint does not allege any contacts between the Councils and Texas. This alone requires rejecting the government's assertion of personal jurisdiction over the Councils. *See Baird v. Shagdarsuren*, 426 F. Supp. 3d 284, 291 (N.D. Tex. 2019) (requiring "factual allegations that reasonably suggest that personal jurisdiction exists").

Regardless, the government's new facts are insufficient as a matter of law. That is because the contacts in the state must give rise to the declaratory judgment action. In *Dallas Texans Soccer Club v. Major League Soccer Players Union*, 247 F. Supp. 3d 784 (E.D. Tex. 2017), the court found there was no general jurisdiction over the defendant union even though it had members in Texas, it met with players in Texas, and the national contract covered two teams that played in Texas, because the union's contacts with two Texas teams were only a "portion" of "its activities nationwide." *Id.* at 789. The court further explained that even if these constituted minimum contacts, they would still not establish specific jurisdiction because those were not the contacts that gave rise to the declaratory judgment action. *Id.* at 790. Finally, the true basis for that suit, a litigation threat by the union, did not support specific jurisdiction because it was not made in Texas and "was not directed to Texas residents any more than residents of any state." *Id.* at 790-91.

Attempting to avoid the obvious parallels with this case, the government attempts to argue that this litigation was not brought because of concerns that Defendants would litigate to challenge the EO, but rather because of "Defendants' continued implementation and enforcement of the CBAs." Opp'n at 14. There are at least two fatal defects in that theory.

First, the event that "gave rise" to the government's declaratory judgment action is

obviously the EO and its prospective implementation. As the Complaint states, "[i]n light of the Executive Order and OPM guidance, Plaintiffs now respectfully seek a declaratory judgment from this Court." Compl. ¶ 10. As alleged in the Complaint, it is the EO that changed the legal landscape, purportedly voiding the CBAs and creating conflict with the Defendants. Compl. ¶ 13 ("Plaintiffs' potential termination of the relevant CBAs—through implementation of the Executive Order …—create[s] a conflict with continued federal union operation under the existing CBAs.").

Second, even if one accepts the counterintuitive argument that the events giving rise to this action are the "continued implementation and enforcement of the CBAs," Opp'n at 14, that theory still fails because the Complaint does not allege the Councils took *any actions*, let alone in Texas, to implement or enforce the CBAs. *See Libersat v. Sundance Energy, Inc*., 978 F.3d 315, 319 (5th Cir. 2020) (personal jurisdiction must be separately established for each defendant). The Councils negotiated their CBAs on a nationwide basis with the agencies, not with any Texas entity. MTD 12-13; *cf. Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985). Moreover, because this lawsuit was filed before the EO was published, the government cannot contend that it was filed in response to anything the Councils actually did. At most, the suit was filed in *anticipation* of what the Councils might later do. But one cannot speculate one's way into personal jurisdiction based on future events. Personal jurisdiction exists only if the defendant has "purposefully directed" its activities to the forum state such that it has "fair warning" it may be subject to jurisdiction based on those activities. *Burger King,* 471 U.S. at 472; *see Dallas* at 790 ("[A] plaintiff or third party's unilateral activities cannot establish minimum contacts between the defendant and forum state").

**2.** Venue is improper under § 1391(b)(2) because a substantial portion of the events giving rise to this suit did not occur in this district. The primary event that gave rise to this lawsuit was the EO, *see supra* at 9, which the government does not contest was signed in Washington, D.C.

Moreover, allegations about future events cannot satisfy § 1391(b)(2), which requires an analysis of "events or omissions" that have "occurred." MTD 14.

**3.** Finally, venue is improper under § 1391(b)(3) because this suit could have been brought in Washington, D.C. Although the government asserts, without any analysis or citation, that Washington, D.C. would have been an improper venue, case law clearly provides otherwise. *See Wolfram Alpha LLC v. Cuccinelli*, 490 F. Supp. 3d 324, 331–32 (D.D.C. 2020) ("[C]ourts generally focus on where the decisionmaking process occurred to determine where the claims arose.").

## IV.    AFGE District 10 is not a proper defendant.

As Defendants explained in their MTD and accompanying affidavit, District 10 is not an entity that can be sued. MTD 2-3 (citing Sanghvi Decl. ¶¶ 9-10). Rather than directly addressing the facts, the government attributes actions to District 10 (e.g., "handling grievances") that are not alleged in the Complaint, and which in any event are not performed by District 10 in its own name. *Id.* at 11; Sanghvi Decl. ¶ 10.[4] In short, District 10 is not a proper defendant.[5]

## CONCLUSION

For all those reasons, the government's claim should be dismissed with prejudice.

Date: May 12, 2025                         Respectfully submitted,

                                          /s/Charles Ainsworth

Abigail V. Carter                         Charles Ainsworth
D.C. Bar No. 474454                       Texas State Bar No. 00783521
Joshua Shiffrin*                          **Parker, Bunt & Ainsworth, P.C.**

---

[4] The government cites to a case where a different AFGE District was named as a co-defendant. But that case was dismissed for lack of subject-matter jurisdiction (AFGE did not move for summary judgment, *contra* Opp'n 10) and the court did not reach the issue. *See* Opp'n 11 (citing *Rogers v. AFGE*, 2019 WL 11317921 (N.D. Ga. 2019), *aff'd* 777 F. App'x 459 (11th Cir. 2019)).

[5] It would not be appropriate to repair the government's error by treating this lawsuit as a case against AFGE, as suggested by the government in a footnote. Opp'n 11 n.7. A plaintiff cannot amend a complaint through an opposition brief. *See Energy Coal*, 836 F.3d at 462 n.4. Regardless, any subsequent amendment to replace District 10 with AFGE would be futile because it would not address the fatal flaws in Plaintiffs' case described in Parts I-III.

Lane Shadgett*                                          100 E. Ferguson Suite 418
**Bredhoff & Kaiser, PLLC**                             Tyler, TX 75702
805 15th Street NW, Suite 1000                          Tel. (903) 531-3535
Washington, D.C. 20005                                  charley@pbatyler.com
Tel. (202) 842-2600
Fax (202) 842-1888
acarter@bredhoff.com
jshiffrin@bredhoff.com
lshadgett@bredhoff.com

*Attorneys for Defendants*

*\*Admitted Pro Hac Vice*


## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the above and foregoing Reply is being sent to

counsel for Plaintiffs via the Court's electronic filing system on May 12, 2025.


<u>/s/Charles Ainsworth</u>