UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| United States Department of Defense, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Case No. 6:25-cv-00119-ADA |
| | § | |
| American Federation of Government Employees, AFL-CIO, District 10, et al., | § | |
| *Defendants.* | § | |

## **<u>ORDER</u>**

This is a case about authority. More specifically, it is about the proper scope of the authority that different branches possess and should exercise.

In response to a historic number of legal challenges filed against virtually every Executive Order that the President has signed, Plaintiffs seek a declaratory judgment from this Court outlining the authority of the Executive Branch and its agencies. But rather than rush headlong into declaring the limits of the Executive's authority, Article III and judicial prudence require this Court to first recognize the limited scope of its own authority.[1]

Thus, this Court must first resolve Defendants' argument that the Court lacks authority to hear this case because Plaintiffs have failed to establish standing. After

---

[1] As one recent Supreme Court decision makes clear, district courts should exercise caution before granting novel forms of relief. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2548 (2025). In *CASA,* the Supreme Court ruled that universal injunctions "likely exceed the equitable authority that Congress has granted to federal courts" under the Judiciary Act of 1789, finding that no "analogous form of relief" as expansive as universal injunctions existed in 1789. *Id.* at 2548, 2551–2558.

a careful review, this Court holds that Plaintiffs lack standing. Therefore, this Court is without subject matter jurisdiction and the constitutional authority to adjudicate the merits of this case. Accordingly, this case must be dismissed.

Plaintiffs are eight federal agencies that seek a declaratory judgment authorizing them to terminate collective bargaining agreements pursuant to an Executive Order. Plaintiffs make compelling arguments that the Executive Order is a lawful exercise of the President's authority delegated to him by Congress under 5 U.S.C. § 7103(a)(3) and the President's inherent authority under Article II.[2] But, irrespective of the President's authority, Article III's irreducible minimum requirements for standing remain.

Plaintiffs ask this Court to do something it should not and cannot do: issue a declaratory judgment pre-approving the acts of executive agencies absent a legally cognizable injury-in-fact. This Court is unable to identify a single instance in which a federal court has exercised jurisdiction over agencies seeking a pre-enforcement declaratory judgment approving their desired future course of conduct. Plaintiffs' suit, however well-intentioned, is an unprecedented invitation for an advisory opinion—one that could open a Pandora's Box of encouraging the Executive Branch to seek the Judiciary's blessing for every Executive Order prior to implementation. Article III's limitations require this Court to decline that invitation.

---

[2] At the time this Order was being written, the Supreme Court stayed a preliminary injunction entered by the Northern District of California enjoining further implementation of another similar Executive Order. The Supreme Court stayed the injunction "[b]ecause the Government is likely to succeed on its argument that the Executive Order and Memorandum are lawful." *Trump v. Am. Fed'n of Gov't Emps.*, 606 U.S. ----, 2025 WL1873449, at *1 (2025) (granting stay of district court's preliminary injunction).

For these reasons and those articulated below, Defendants' Motion to Dismiss (ECF No. 41) is **GRANTED.**

## I.    Background

In the 1970s, Congress enacted the Federal Service Labor-Management Relations Statute (FSLMRS). 5 U.S.C. § 7101 *et seq*. The FSLMRS "provides certain protections, including union representation, to a variety of federal employees." *NASA v. Fed. Lab. Rels. Auth.*, 527 U.S. 229, 231 (1999). But Congress did not "include the entire federal workforce within this regime." *Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*, 870 F.2d 723, 724 (D.C. Cir. 1989). The FSLMRS exempts several agencies from coverage, such as the Federal Bureau of Investigation. *See* 5 U.S.C. § 7103(a)(3).

The FSLMRS also authorizes the President to exclude agencies under certain circumstances. *Id.* § 7103(b)(1). The FSLMRS provides that the President may issue an order excluding any agency from coverage "if the President determines that— (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." *Id.*

On March 27, 2025, President Trump issued Executive Order No. 14,251 invoking this authority. *See* ECF No. 41-2, at 2. The President determined that numerous agencies and agency subdivisions "have as a primary function intelligence, counterintelligence, investigative, or national security work" and that the FSLMRS cannot be applied to them "in a manner consistent with national security

requirements and considerations." *Id.* Among the agencies listed in the Executive Order are the Department of State, the Department of Veterans Affairs, and the Environmental Protection Agency. *Id.* at 2–4.

On the same day the Executive Order was issued, the Office of Personnel Management ("OPM") provided guidance to the agencies listed in the order. ECF No. 41-2 at 11. OPM stated that the covered agencies "are no longer required to collectively bargain with Federal unions." *Id.* at 13. OPM explained that the relevant unions had lost their status as the exclusively recognized labor organizations for employees of the covered agencies. *Id.* OPM instructed the agencies to "consult with their General Counsels as to how to implement the President's directive." *Id.*

Plaintiffs similarly filed this lawsuit on the same day the Executive Order was issued. ECF No. 1 at 36. Plaintiffs are eight federal agencies,[3] all but one of which were excluded from coverage under the FSLMRS by the Executive Order. *Id.* at 1; ECF No. 41-2 at 2–4. Plaintiffs are suing the American Federation of Government Employees District 10 ("AFGE") and thirty-six local unions and councils affiliated with AFGE. ECF No. 1 at ¶¶ 24, 25–60. Defendants represent federal employees throughout Texas. *Id.*

Plaintiffs allege that they previously executed collective bargaining agreements ("CBAs") with Defendants that remain in effect. *Id.* at ¶ 77. Plaintiffs claim that the CBAs prevent them "from adopting personnel policies that align with

---

[3] The Department of Defense, Department of Agriculture, Environmental Protection Agency, Department of Homeland Security, Department of Housing and Urban Development, Department of Justice, Social Security Administration, and Department of Veterans Affairs. ECF No. 1 ¶¶ 16–23.

the President's priorities and interfere with the President's direction of agencies engaged in sensitive operations implicating the Nation's security, intelligence, counterintelligence, or investigative functions." *Id.* at ¶ 169. For example, Plaintiffs allege that the CBAs require them to "provide prolonged performance improvement periods for underperforming employees before proposing termination or removal." *Id.* at ¶ 170.

Plaintiffs dispute their "obligation to continue abiding by the terms of the CBAs because they have been exempted from the FSLMRS by the President's Executive Order." *Id.* at ¶ 171. But Plaintiffs predict that "Defendants assuredly will not agree that the CBAs can be lawfully rescinded or repudiated." *Id.* at ¶ 172. Plaintiffs point to an article posted by the National Council of AFGE entitled "What AFGE Is Doing: A Recap of AFGE's Major Actions Against Trump's Attacks on Civil Service." *Id.*

Based on the foregoing, Plaintiffs claim that there is "a concrete and immediate dispute over the rights of the parties, leaving Plaintiff agencies with uncertainty regarding their power to terminate the subject CBAs pursuant to the Executive Order." *Id.* at ¶ 173. To ensure "legal certainty and avoid unnecessary labor strife," Plaintiffs ask the Court to issue a declaratory judgment confirming that they are legally entitled to rescind the CBAs. *Id.* at ¶ 11. In particular, Plaintiffs seek a declaration that they "are authorized to terminate their CBAs pursuant to the Executive Order and OPM's implementing guidance." *Id.* at 36.

Shortly after Plaintiffs filed suit, AFGE and other unions sued the President, OPM, and several federal agencies in the Northern District of California. *AFGE v. Trump*, Case No. 3:25-cv-03070-JD (N.D. Cal.), ECF No. 1. They alleged that the Executive Order retaliates against their protected First Amendment activity, seeking declaratory and injunctive relief. *Id.* The Northern District of California enjoined the Executive Order, but the Ninth Circuit stayed the injunction pending appeal. *AFGE v. Trump*, No. 3:25-cv-03070-JD (N.D. Cal. Apr. 3, 2025), ECF No. 68. That litigation remains ongoing.

Defendants now move to dismiss Plaintiffs complaint for three reasons. ECF No. 41 at 2. First, Defendants argue that the government lacks standing to seek declaratory relief against them. *Id.* at 4. Second, Defendants argue that this Court is not a permissible venue for the government's claims. *Id.* at 11. Finally, Defendants argue that the Court should exercise its discretion to dismiss the government's declaratory judgment action. *Id.* at 16. The Court dismisses this case on the first ground.

## II.    Legal Standard

Defendants move to dismiss this case pursuant to Federal Rule of Civil Procedure 12(b)(1). ECF No. 41 at 4. "Rule 12(b)(1) motions challenge the subject matter jurisdiction of the district court." *McLin v. Twenty-First Jud. Dist.*, 79 F.4th 411, 415 (5th Cir. 2023). When a defendant brings a Rule 12(b)(1) motion, "the plaintiff bears the burden of proof in establishing that jurisdiction does in fact exist." *Porretto v. City of Galveston Park Bd. of Trs.*, 113 F.4th 469, 481 (5th Cir. 2024). To

do that at the pleading stage, the plaintiff must "allege a plausible set of facts establishing jurisdiction." *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 652 (5th Cir. 2012). "All well-pleaded facts are accepted as true and viewed in the light most favorable to the plaintiff." *Shemwell v. City of McKinney*, 63 F.4th 480, 483 (5th Cir. 2023) (internal quotations and citations omitted).

## III.    Discussion

To say that the approach of filing a declaratory judgment action in the manner employed by the Plaintiffs is novel is an understatement. The Court cannot find any precedent supporting the relief which Plaintiffs now seek. The lack of historical precedent establishing standing is anathema to the Supreme Court's directive that "history and tradition" offer a "meaningful guide to the types of cases that Article III empowers federal courts to hear." *United States v. Texas*, 599 U.S. 670, 677 (2023). Neither side to this lawsuit has identified a single instance where a federal court has exercised jurisdiction over a case in which the Executive Branch sought a pre-enforcement declaratory judgment approving of its course of conduct, much less an instance where a court granted the relief sought. As the Supreme Court has articulated, the lack of historical precedent supporting Plaintiffs' assertion of standing is a telling indication of the severe constitutional problem Plaintiffs face. *See id.* Against this backdrop of precedent, this Court must decide whether it ought to determine that Plaintiffs have standing when no other court has previously done so.

The Court ultimately concludes that Plaintiffs' claims are non-justiciable for two related reasons. First, Plaintiffs' articulated injuries are not redressable injuries-in-fact sufficient to confer standing. Second, Plaintiffs seek an impermissible advisory opinion by requesting this Court's preemptive approval of Plaintiffs' desired future conduct. This Court's injury-in-fact analysis discusses why the allegations set forth in Plaintiffs' Complaint are insufficient to confer standing, while the Court's analysis regarding the constitutional ban on advisory opinions outlines more generalized concerns with the nature of this case.

Another district court has directly addressed the present standing issue and reached the same conclusion as this Court. *See Dep't of Treasury v. Nat'l Treasury Emps. Union (NTEU), Chapter 73*, No. 2:25-049-DCR, 2025 WL 1446376 (E.D. Ky May 20, 2025) (dismissing the Department of Treasury's suit for declaratory relief on the grounds that the government failed to establish standing). This Court has carefully considered Judge Reaves's thoughtful opinion with the added benefit of the Supreme Court's recent opinion in *Trump v. CASA*.

This Court's decision to dismiss this case for lack of jurisdiction is bolstered by the Supreme Court's recent decision in *Trump v. CASA,* wherein the Supreme Court held that universal injunctions likely exceed the equitable authority that Congress has granted to federal courts. *CASA*, 145 S. Ct. at 2548.

The Supreme Court noted that by the end of the Biden administration, we had reached "a state of affairs where almost every major presidential act [was] immediately frozen by a federal district court." *Id.* This is the same position the

Trump administration found itself in, with district courts issuing nearly 25 universal injunctions in the first 100 days of the second Trump Administration. *Id.* Under these circumstances, and pre-*CASA*, the Court is sympathetic to the administration's desire for legal certainty with respect to its ability to enforce its Executive Orders when faced with the unavoidable reality that a district court somewhere will likely issue a universal injunction. Although the future is far from certain, it is appropriate to presume that district courts will faithfully adhere to the Supreme Court's holding in *CASA*, which curtails the availability of universal injunctions. This Court must assume that district judges will follow that precedent, and doing so ameliorates some of the legitimate concerns raised by Plaintiffs. *See id.*; ECF No. 47 at 9 (Plaintiffs citing Defendants' parent union seeking an injunction as evidence of foreseeable "coercive action").

In reaching its well-reasoned decision in *CASA*, the Supreme Court carefully analyzed whether there was a sufficient historical analog to modern universal injunctions. *CASA*, 145 S. Ct. at 2551. Ultimately, the Supreme Court stated the "bottom line" was that the "universal injunction was conspicuously nonexistent for most of our Nation's history." *Id.* at 2553. Here, pre-enforcement declaratory judgments pre-approving an Executive Order have been conspicuously nonexistent for *all* of this Nation's history.

*CASA* was not decided upon the issue of standing before us today. Nonetheless, the practical impact of the holding in *CASA* as well as the core legal principle espoused by the Supreme Court remains central to this Court's decision today—

"federal courts do not exercise general oversight of the Executive Branch; they resolve cases and controversies consistent with the authority Congress has given them." *Id.* at 2562. Absent a justiciable case or controversy, this Court will not exercise general oversight of the Executive Branch. Accordingly, this case is dismissed for lack of subject matter jurisdiction.[4]

### A. Plaintiffs lacked standing at the time the suit was filed.

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007). "[A] case or controversy can exist only if a plaintiff has standing to sue." *United States v. Texas*, 599 U.S. 670, 675 (2023). To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). Standing must exist at the commencement of the litigation. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

An injury-in-fact occurs when the plaintiff suffers "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quotation marks and citation omitted). Because an injury must be imminent, "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*,

---

[4] Because the Court holds that it lacks subject-matter jurisdiction over Plaintiffs' claims, it does not reach Defendants' arguments regarding improper venue or discretionary dismissal. This decision says nothing on the merits of the case.

568 U.S. 398, 409 (2013) (quotation marks and citation omitted). Federal courts do not enjoy "a roving commission to publicly opine on every legal question." *TransUnion*, 594 U.S. at 423.

The question here is whether Plaintiffs have standing to seek declaratory relief. The Declaratory Judgment Act authorizes federal courts to declare the rights of parties seeking a declaration, provided the case presents an "actual controversy." 28 U.S.C. § 2201(a). An actual controversy exits when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quotation marks and citation omitted). The controversy must exist "at the time the complaint was filed—post filing conduct is not relevant." *Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir. 2009).

In their Complaint, Plaintiffs allege that "[a]n actual controversy has arisen and now exists between the parties concerning the rights and obligations of Plaintiffs under the terms of the CBAs." ECF No. 1 at 34. Plaintiffs explain that they no longer feel obligation to abide by the CBAs but that "Defendants assuredly will not agree that the CBAs can be lawfully rescinded or repudiated." *Id.* at 35. Plaintiffs therefore claim that there is "a concrete and immediate dispute over the rights of the parties, leaving Plaintiff agencies with uncertainty regarding their power to terminate the subject CBAs pursuant to the Executive Order." *Id.*

The Court disagrees. Plaintiffs have not established that an actual controversy existed at the time the Complaint was filed. Plaintiffs filed this lawsuit before the White House even publicly announced the Executive Order. ECF No. 41-3 at 2–4 (showing that Plaintiffs filed this lawsuit about an hour and a half before the Executive Order was publicly announced). It is difficult to imagine how the parties could have formed a concrete dispute over the Executive Order when that document had not yet been released to the public.

Plaintiffs have not alleged that they received any pushback from Defendants regarding the Executive Order prior to filing their complaint. For example, there is no allegation that Defendants explicitly or implicitly threatened to sue Plaintiffs over the Executive Order. Indeed, the general counsel for AFGE claims that it and its affiliates "did not receive any prior notice—before the issuance of the Executive Order—of the Administration's intention to eliminate statutory collective bargaining rights from employees in the [relevant] agencies." ECF No. 41-1, at 1.

Perhaps realizing that no controversy existed, Plaintiffs predicted in their complaint that "Defendants assuredly will not agree that the CBAs can be lawfully rescinded or repudiated." ECF No. 1 at 35. But this is nothing more than speculation about what would happen after the Executive Order came out. *Cf. Clapper*, 568 U.S. at 409 (holding that a theory of future injury was too speculative to satisfy requirement that threatened injury must be certainly impending). Plaintiffs have not plausibly shown that they were operating under any real threat of action by Defendants. At best, they point to an AFGE press release discussing how it is

"fighting back" against the President's agenda. That is not enough to show an actual controversy between the parties.

### i.   Plaintiffs' suit is distinct from *MedImmune* and does not present an existing case or controversy.

Plaintiffs argue that they have standing under the Supreme Court's analysis in *MedImmune, Inc. v. Genentech, Inc.* A cursory comparison of *Medimmune* and this dispute may seem analogous as two instances in which a party sought only to have their contractual obligations declared. However, when considered in context, *MedImmune* and this dispute ask fundamentally different questions. This Court finds that this suit presents two key distinctions that necessitate a different result.

First, the lack of threatened litigation sets this case apart. *MedImmune* involved a dispute over whether royalty payments were due under the parties' license agreement. 549 U.S. at 121–22. The plaintiff did not think royalties were owing, believing that the underlying patent was invalid and unenforceable. *Id.* But the plaintiff considered a letter from the defendant to be a clear threat to enforce the patent, terminate the license agreement, and sue for patent infringement if the plaintiff did not make the payments. *Id.* at 122. If the defendant were to prevail, the plaintiff could have been ordered to pay treble damages and attorneys' fees and could have been enjoined from selling a product that accounted for eighty percent of its sales revenue. *Id.* at 122–123. So, the plaintiff sought a declaratory judgment that the underlying patent was invalid and unenforceable. *Id.* at 123. The Supreme Court concluded that the plaintiff need not risk treble damages and the loss of eighty

percent of its business before seeking a declaration of its actively contested legal rights.

Here, in contrast to *MedImmune*, Plaintiffs were not living under a threat of suit when they filed their Complaint. Indeed, Plaintiffs do not even allege that Defendants contacted them regarding the Executive Order prior to the filing of this case. Plaintiffs now argue that they "faced imminent and foreseeable" coercive action by Defendants, pointing out that Defendants quickly filed a lawsuit challenging the Executive Order in the United States District Court for the Northern District of California. ECF No. 47 at 9. But, Plaintiffs cannot rely on post filing conduct to prove that an actual controversy existed at the time the complaint was filed. *Vantage Trailers*, 567 F.3d at 748 ("[P]ost filing conduct is not relevant.").

Second, this suit presents separation-of-powers concerns not present in *MedImmune*. That case involved private litigants engaged in a licensing contract disputing the underlying validity of a patent. *MedImmune*, 549 U.S. at 121–22. The case before us involves the Executive Branch and federal workers unions engaged in CBAs disputing the underlying constitutionality and validity of an Executive Order. To preemptively assess the propriety of the agencies' desired contractual actions pursuant to the Executive Order, this Court would first have to declare the Executive Order to be valid. *MedImmune* neither sought nor approved of any such declaration regarding the validity of a law or executive order. *See id.* at 126–137.

Put simply, *MedImmune* presented as a patent validity dispute between private parties clothed as a contract dispute. By contrast, this case presents as a

constitutional dispute about the validity of an Executive Order clothed as a contract dispute. Although both *MedImmune* and this case hinge on questions of validity, this Court finds that a federal court declaring the validity of a patent to resolve a dispute between private litigants is profoundly different from preemptively declaring the validity of the Executive Branch's desired future actions, particularly when viewed through the lens of separation of powers. After all, standing is built on a single basic idea—the separation of powers. *Hippocratic Med.,* 602 U.S. at 378.

### ii. Plaintiffs' alleged inability to manage their workforces does not constitute a legally cognizable injury.

Plaintiffs argue that their "inability to manage their workforces as they wish without facing substantial legal uncertainty—and its attendant costs—constitutes a cognizable injury." ECF No. 47 at 8. Plaintiffs explain that if they "proceeded with the intended terminations of their CBAs only to have those actions declared unlawful by the [Federal Labor Relations Authority] or a court, that could cost Plaintiffs time and money given the process for reinstating CBAs and potential backpay and attorney fee awards." *Id.* Plaintiffs argue, for example, that "the FLRA could order status quo ante (SQA) relief that would require Plaintiff agencies to rescind their actions, return to the prior status quo, give notice to the unions, and then engage in further bargaining." *Id.* Plaintiffs assert that they should not have to make the "Hobson's choice" of acting at their peril to clarify their rights under the law. *Id.*

Again, the Court must return to the primary focus of this analysis. The question that governs this Court's standing analysis is whether there was an actual controversy at the time of filing. The answer is no. Was there a possibility that a

lawsuit seeking to enjoin the Executive Order would be filed, given the numerous challenges brought against other executive orders? Yes. But Article III standing is not satisfied by mere possibilities or anticipated legal challenges. Here, the parties did not have an ongoing dispute over the Executive Order when this lawsuit was filed. In hindsight, we know that Defendants oppose the Executive Order and seek a judgment that it is unconstitutional. But Plaintiffs have not plausibly shown that such a dispute existed when they filed this lawsuit. Thus, Plaintiffs' argument about what the FLRA could do down the road and how that could harm them is beside the point.

### iii.    Plaintiffs' existing obligations under the CBAs are insufficient to confer standing.

Plaintiffs next assert that they are currently harmed by compliance with the CBAs existing obligations. Plaintiffs explain that the CBAs require Plaintiffs to "provide prolonged performance improvement periods for underperforming employees before proposing termination," "employ heightened burdens of proof for misconduct-based removals," and "permit employees to perform union business during official duty hours." ECF No. 1 at ¶ 170. Plaintiffs argue that the CBAs "restrict Plaintiffs from implementing this Administration's workforce policies." ECF No. 47 at 16. Plaintiffs assert "[t]hese injuries can be remedied by a ruling in favor of Plaintiffs that the CBAs are null and void in light of Executive Order 14,251 because such a ruling would preclude Defendants from enforcing the CBAs." *Id.* At bottom, these assertions are centered on Plaintiffs' existing obligations under the CBAs.

The Court finds that Plaintiffs' assertions regarding their existing obligations under the CBAs are insufficient to confer standing. Plaintiffs cite *MedImmune* to argue that they have standing for this declaratory suit, but *MedImmune* itself instructs that standing is not conferred by mere compliance with a contractual obligation. 549 U.S. at 129 n.9. *MedImmune* conferred standing to the declaratory plaintiff by focusing on the concept of coercion—specifically, the coercion that puts a challenger to the choice between abandoning his rights or risking prosecution. *Id.* at 129. *MedImmune* forecloses Plaintiffs' argument that compliance with contractual obligations creates an injury-in-fact, as "the relevant coercion is not compliance with the claimed contractual obligation, but rather the consequences of failure to do so." *Id.* The injury to be considered under *MedImmune*, then, is the consequence of noncompliance, not the consequence of compliance itself. Having already discussed why the speculative consequences of the agencies' potential failure to comply with the CBAs are insufficient to confer standing, the Court need not delve further into the consequences of compliance.

### iv.    Plaintiffs have not alleged a sovereign injury sufficient to confer standing.

Plaintiffs claim that their current inability to implement the President's workforce policies because of the existence of the CBAs constitute a sovereign injury distinct from this Court's *MedImmune* analysis. This argument also fails.

The government can have a sovereign interest in the exercise of power over individuals and entities within the relevant jurisdiction. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). Recognized amongst these

sovereign interests is the federal assertion of authority to regulate matters they believe they control. *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 770 (5th Cir. 2023). For a sovereign injury to support Article III standing, a defendant's acts must invade that sovereign right, resulting in "some tangible interference with its authority to regulate or to enforce its laws." *Id.* (quoting *Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 957 (6th Cir. 2020)). Injuries of this type conventionally arise when the government enacts a law, enforces it against a resident, and the resident refuses to comply. *Id.* at 771 (citing *Saginaw Cnty.*, 946 F.3d at 956). In this context, no justiciable controversy exists until a government claimant enforces the law against an individual. *Saginaw Cnty.*, 946 F.3d at 956. The government cannot turn to the federal courts to resolve mere "differences of opinion" about what its powers permit or what the law requires in a potential future application. *Id.*

Here, that is precisely what the government is doing: turning to this Court to resolve a "difference of opinion" about what its power permits in a potential future application. Plaintiffs have not enforced the Executive Order against any individual—a requirement to create a justiciable controversy in the sovereign injury context. *See id.* at 959. As discussed earlier, it is apparent from the Complaint that no enforcement of the Executive Order or OPM's guidance has occurred. At the time of filing Plaintiffs alleged only speculative fear, that *if* Plaintiffs enforce the Executive Order in a certain way against the Defendants, the Defendants *might* refuse to comply. *See id.* That is not enough for an Article III injury.

18

v.   **AFGE's subsequently filed California Complaint does not confer standing to Plaintiffs' declaratory suit.**

Plaintiffs argue an actual controversy exists because Defendants are currently seeking an injunction in United States District Court for the Northern District of California ("NDCA"). ECF No. 47 at 7 (citing *AFGE v. Trump*, No. 3:25-cv-3070 (N.D. Cal. Apr. 3, 2025)). This argument fails for two reasons.

First, at the time Plaintiffs' Complaint was filed, Defendants' Complaint in NDCA challenging the Executive Order was not yet filed—nor could it have been, as the Executive Order had not yet been publicly announced. It is not sufficient that Plaintiffs could legitimately believe with reasonable certainty based on the first one hundred days of President Trump's administration that a lawsuit would be filed.

Second, simply because a declaratory judgment plaintiff is the proper defendant in another suit does not mean the plaintiff is exempt from Article III's standing requirements in a declaratory judgment action. *Texas v. Travis Cnty.*, 272 F. Supp. 3d 973, 979 (W.D. Tex. 2017), *aff'd*, 910 F.3d 809 (5th Cir. 2018); *Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 880 (N.D. Tex. 2008). The Court finds *Travis County* and *Villas at Parkside* persuasive on this point.

Both *Travis County* and *Villas at Parkside* are cases in which a governmental entity sought a pre-enforcement declaratory judgment ratifying the government's desired future course of conduct. *Travis Cnty.*, 272 F. Supp. 3d at 979; *Villas at Parkside*, 577 F. Supp. 2d at 884. The government plaintiffs in both cases pointed to the existence of parallel litigation brought by the defendants to challenge the law in another forum as evidence of an existing case or controversy. *Travis Cnty.*, 272 F.

Supp. 3d at 977; *Villas at Parkside*, 577 F. Supp. 2d at 884. This argument was rejected by both courts as being insufficient to confer standing. *Travis Cnty.*, 272 F. Supp. 3d at 979; *Villas at Parkside*, 577 F. Supp. 2d at 884–85. Ultimately, both courts dismissed the government's claims for lack of standing and cited concerns about the well-established constitutional ban on advisory opinions. *Travis Cnty.*, 272 F. Supp. 3d at 981; *Villas at Parkside*, 577 F. Supp. 2d at 885.

In *Travis County,* the court dismissed the State's declaratory judgment action for lack of standing. *Travis Cnty.*, 272 F. Supp. 3d at 979. The State filed suit seeking a pre-enforcement declaration that Senate Bill 4 was constitutional. *Id.* at 976. A day after the government filed its complaint, many defendants brought a traditional challenge to the bill's constitutionality in another forum. *Id.* at 977. The State pointed to this parallel litigation as evidence of an existing case or controversy. *Id.* However, the court rejected the argument that the State could piggyback on the defendants' standing in the related litigation filed in another forum. *Id.* at 979. The court clarified that even where a defendant may have standing to bring suit elsewhere, a declaratory judgment plaintiff must independently demonstrate standing and cannot sidestep Article III's requirements simply by reversing the posture of the parties. *Id.* (citing *BroadStar Wind Sys. Grp., L.L.C. v. Stephens*, 459 F. App'x 351, 356 (5th Cir. 2012)).

Similarly, in *Villas at Parkside*, the court dismissed the city's counterclaim for declaratory relief on the ground that it sought a constitutionally impermissible advisory opinion. 577 F. Supp. 2d at 886. There, the city attempted to preemptively validate the constitutionality of a newly enacted ordinance. *Id.* at 884. Although an

20

earlier version of the ordinance had been challenged by traditional litigation and even preliminarily enjoined, the court held that this parallel litigation did not create a justiciable controversy for the city to seek a declaratory judgment that the ordinance was constitutional. *Id.* The court rejected the city's effort to derive standing from the plaintiffs' challenge to the earlier ordinance, explaining that the attempt appeared to be "an end-around the injunction" and a request for an advance ruling on the constitutionality of the ordinance. *Id.* The court noted, as this Court does here, that it could find no legal authority for the defendant's proposition. *Id.* The court reasoned that the city had "put the cart before the horse" by seeking to avoid traditional litigation and concluded with a warning that granting the city's request would open a "Pandora's box," inviting government agencies to obtain judicial pre-approval of legislation in advance of any real-world application. *Id.* at 884–85.

*Travis County* and *Villas at Parkside* are plainly analogous and relevant to this dispute. In both cases, the government sought a pre-enforcement declaration regarding the validity of its desired future course of conduct. *Travis Cnty.*, 272 F. Supp. 3d at 979; *Villas at Parkside*, 577 F. Supp. 2d at 884. Here, just as in both of those cases, the government argues that the existence of traditional litigation brought by the defendants creates an existing case or controversy. *See Travis Cnty.*, 272 F. Supp. 3d at 977; *Villas at Parkside*, 577 F. Supp. 2d at 884. This Court adopts the legal analysis employed in those cases and finds that the existence of parallel litigation is insufficient to transform the government's request from an impermissible advisory opinion into a justiciable case or controversy.

This Court notes that while the extraordinary volume of lawsuits filed against President Trump's Administration may be historic and unprecedented, every governing body since the Nation's founding has faced the same potential for legal challenges to the validity of its laws or Executive Orders. *See Travis Cnty.,* 272 F. Supp. 3d at 980 ("[T]he State faces the same potential threat every government agency at every level faces when it enacts a new law—the threat that someone may challenge the constitutional validity of the law. That is not a justiciable injury.")

**B. Plaintiffs seek an advisory opinion.**

At bottom, Plaintiffs' Complaint seeks an advisory opinion. *See* ECF No. 1 at ¶¶ 11, 169 (stating that the agencies "wish" to rescind the CBAs but seek a declaratory judgment to "ensure legal certainty" before doing so and asking the Court to preemptively affirm their belief that they may rescind the CBAs). It is difficult for this Court to understand how any complaint filed by the government seeking a pre-enforcement, and in this instance, pre-announcement, declaratory judgment green lighting its desired future course of conduct would not be an advisory opinion.

Federal courts have uniformly declined to issue advisory opinions for more than two centuries. As the Supreme Court explained to President George Washington in 1793 in response to his request for a legal opinion, federal courts do not issue advisory opinions about the law, even when requested by the President. *All. for Hippocratic Med.*, 602 U.S. at 378–79 (citing 13 Papers of George Washington: Presidential Series 392 (C. Patrick ed. 2007)). "Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper*, 568 U.S. at 408 (citations

omitted). As such, a court's standing inquiry has been especially rigorous when asked to determine whether an action taken by the Executive or Legislative branch is constitutional. *Raines v. Byrd,* 521 U.S. 811, 819–20 (1997).

Though centuries later and lodged under a different procedural mechanism, Plaintiffs' Complaint suffers the same fundamental flaw as President Washington's 1793 request. Here, Plaintiffs' Complaint seeks "legal certainty" in the form of a declaratory judgment to "confirm that they are legally entitled to proceed" with their desired future course of conduct. ECF No. 1 at ¶ 11. This Court is sympathetic to Plaintiffs' desire for legal certainty and the avoidance of future labor strife. But it is beyond the power of an Article III judge to provide preemptive legal certainty to the acts of the Executive or Congress. *See Muskrat v. United States*, 219 U.S. 346, 361 (1911) (explaining that the judicial power does not extend to issuing advisory opinions "as a body with revisory power over the action of Congress"). Rather, it is this Court's "most important and delicate" duty to resolve the rights of litigants only in justiciable controversies. *Id.* And in this instance, Plaintiffs' attempt to obtain a judicial declaration of the validity of an act of the Executive "is not presented in a 'case' or 'controversy,' to which, under the Constitution of the United States, the judicial power alone extends." *Id.*

### i.    The circumstances surrounding the filing of this suit confirm that Plaintiffs seek an advisory opinion.

The timeline of events in this litigation heightens this Court's concerns regarding the issuance of an advisory opinion.

As discussed above, Plaintiffs filed this suit seeking a declaratory judgment stating that Plaintiffs are authorized to terminate their CBAs pursuant to an Executive Order that had not been enforced, challenged, or even publicly announced. Put another way, the government sought a declaratory judgment pre-approving the legality of its desired future conduct—a quintessential request for an advisory opinion.

It is nearly impossible to conceive of a government action that could not theoretically subject it to subsequent litigation or potential liability. Thus, a holding in this case that confers standing to the government seeking a declaratory judgment based on avoiding potential future litigation is a holding that would effectively allow it to seek pre-approval of every government action. *See Villas at Parkside*, 577 F. Supp. 2d at 884–85.

Allowing the government to seek a declaratory judgment every time (as in this case) the Executive signs a new Executive Order appears to this Court to simply be an escalation in the battle to gain some advantage by being able to select the venue in which the litigation is filed. The perception, whether correct or not, that one party or the other can gain advantage by selecting a favorable forum threatens the legitimacy of the federal courts.

Plaintiffs argue that they are not asking the Court to opine on a "hypothetical set of facts" because the President has already exercised his authority in issuing Executive Order 14,251. ECF No. 47 at 17. But that argument misses the thrust of the relief that Plaintiffs seek and omits the timing issue discussed above. Plaintiffs

ask for a declaration that "Plaintiff agencies are authorized to terminate their CBAs pursuant to the Executive Order and OPM's implementing guidance." ECF No. 1 at 36. Plaintiffs are not merely asking this Court to approve of the President's authority to issue the Executive Order itself; they are also asking this Court to ratify the agencies' authority to rescind the CBAs under the Executive Order before the agencies take any action towards enforcement. *See id.* The relief Plaintiffs seek would require the Court to declare that (1) the Executive Order was a valid exercise of the President's authority, and that (2) pursuant to the Executive Order, Plaintiff agencies are authorized to terminate their CBAs. *See id.*

Turning to the first issue concerning the validity of the Executive Order, as discussed above, the Order had not yet been publicly announced at the time the Complaint was filed. Because the Executive Order had not been announced or made known to the public at the time the Complaint was filed, Plaintiffs sought an impermissible advisory opinion. The post-complaint announcement of the Executive Order does not change the fact that no case or controversy existed at the time this suit commenced. *See Vantage Trailers,* 567 F.3d at 748.

As to the second issue, Plaintiffs ask this Court to declare that they have the power to terminate the CBAs pursuant to the Executive Order. ECF No. 1 at 36. The Court notes that at the time of the filing, Plaintiffs had not taken action to implement the policies allegedly authorized by the Executive Order and set forth by the OPM. Taking Plaintiffs at their word, they "*first* seek declaratory relief to confirm that they are legally entitled to proceed" before taking actions to enforce the Executive Order.

ECF No 1 at ¶ 11 (emphasis added). Plaintiffs have foregone implementation of the policies set forth by the OPM to "ensure legal certainty and avoid wasting dollars and risking other attendant harms." ECF No. 47 at 5. But even if Plaintiffs' reasons are meritorious and even laudable, that does not cure the Complaint's request for an advisory opinion.

Regardless of Plaintiffs' justifications, it is clear from the pleadings that Plaintiff agencies make no allegation that they have implemented OPM's guidance pursuant to the Executive Order. *See* ECF No. 1 ¶¶ 10–11, 169, 173. Rather than asserting that they have already enforced the Executive Order or terminated the CBAs, Plaintiffs' Complaint merely expresses a wish, belief, and desire to avoid uncertainty about their authority to do so. *See id.* Thus, because no enforcement was in effect (i.e., no case or controversy) at the time the Complaint was filed, Plaintiff agencies sought an impermissible advisory opinion. *See Nat'l Treasury Emps. Union (NTEU), Chapter 73*, 2025 WL 1446376, at *14 (Reeves, J.) (in addressing a nearly identical case, stating that an issue with Plaintiffs' case was "if no enforcement was in effect (i.e., no case or controversy) at the time the Complaint was filed, then Treasury sought an impermissible advisory opinion").

Ultimately, at the time of filing, both questions Plaintiffs ask the Court to resolve would require the issuance of an advisory opinion. First, Plaintiffs seek a preemptive declaration as to the validity of an unannounced Executive Order. Second, they seek a preemptive declaration as to the propriety of future agency actions. This Court can provide neither.

## IV.    Conclusion

In closing, as alluded to during oral argument, it is not lost on this Court that lawsuits of this nature are in many ways both a corollary to the prevalence of district courts issuing nationwide injunctions against Executive Orders as well as an effort to preempt the selection of the forum by those who are likely to challenge the Executive Order in court. Notwithstanding the reasons for dismissal articulated above, the relief Plaintiffs now seek is roughly the flip-side of the same coin as the relief sought by litigants seeking nationwide injunctions against this Administration. One litigant rushes off to select a forum it perceives to be favorable to enjoin an Executive Order; and the Administration now rushes to preempt that injunction with a declaratory judgment in its own forum of choice. While the Court understands the reasoning behind the Administration's response to what it perceives as improper judicial overreach, the solution to perceived judicial overreach is not more judicial overreach, but a return to the principles of judicial restraint and strict adherence to the constitutional limits imposed upon the federal judiciary.

For this reason and those discussed above, this Court hereby **GRANTS** Defendants' Motion to Dismiss (ECF No. 41).

It is **ORDERED** that this case is **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

SIGNED this 23rd day of July, 2025.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE